FEDERAL DEPOSIT INSURANCE
CORPORATION,
Plaintiff–Appellee,

v.

Joseph P. LANIER, et al., Defendants,

and

Bill D. Whittington and Thomas J.
O'Grady, Defendants–Appellants.

No. 90–2650

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

March 18, 1991.

Rehearing Denied April 11, 1991.

Jack D. Hicks, Robert T. Cain, Jr., Zeleskey, Cornelius, Hallmark, Lufkin, Tex., for Whittington and O'Grady.

Preston C. Goodwin, Spring, Tex., for plaintiff-appellee.

Before JOHNSON, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendants guaranteed notes made by D-1 Enterprises, Inc., and its three subsidiaries. The Federal Deposit Insurance Corporation (FDIC), acting in its corporate capacity for the failed bank that had extended the loan, obtained a deficiency judgment against two of the guarantors. Because the bank gave proper notice of its intent to sell the inventory, we affirm the judgment in favor of the FDIC.

I.

Defensive Security Southwest, Inc. (Defensive Security), Defensive Fire Control, Inc. (Defensive Fire), and Unisec, U.S.A., Inc. (Unisec), were distributors and installers of fire alarm and security systems. In 1982, Defensive Security executed a promissory note for $350,000 payable to Commercial State Bank and gave the bank a security agreement covering its accounts receivable and inventory. In addition, Bill Whittington, Joseph Lanier, James Devlin, and Thomas O'Grady contemporaneously gave the bank a continuing guaranty. Defensive Security soon executed another promissory note for $200,000, which was cross-collateralized with the prior note.

Subsequently, with the bank's approval, the shareholders of Defensive Security, Defensive Fire, and Unisec reorganized their companies under a single holding company named D-1 Enterprises, Inc. (D-1), with the three former corporations becoming wholly-owned subsidiaries of D-1. This new corporation then received a revolving line of credit from the bank, evidenced by a promissory note for $1,000,000 (the D-1 note). As collateral, the bank received a security interest in the accounts receivable and inventory of D-1, Defensive Security, and Defensive Fire, and a pledge of stock in D-1. In addition, O'Grady, Whittington, Devlin, and Thomas W. Crafton executed a new, continuing guaranty; Lanier did not guarantee this note.

At this time, D-1 arranged to pay off the $200,000 note and the remainder owing on the $350,000 note. Any remaining princi-

pal amounts on these notes were incorporated as part of the revolving credit, and at the end of 1982 the outstanding principal balance on the D–1 note was $907,669.74.

The revolving line of credit was renewed several times, the last time being on February 4, 1984. This final note is the subject of the instant suit. The bank decided to foreclose its security interest by calling the D–1 note. D–1 and its subsidiaries then filed chapter 11 bankruptcy petitions.

The bank obtained an order from the bankruptcy court authorizing it to foreclose its security interest against the collateral. The bank then sent notice to the parties, stating that it intended to sell the collateral at either a public or private sale ten days after the letter was sent. Four months later, the inventory was sold for $100,000 at a private sale.

The bank brought a deficiency judgment in state court against the guarantors. The FDIC, in its corporate capacity as purchaser and liquidator of the bank's assets, later intervened and removed the case to federal court. The FDIC filed a motion for summary judgment, seeking recovery against all defendants as guarantors. Lanier and Whittington opposed the motion, stating that the bank did not dispose of the collateral in accordance with Texas law. Lanier filed a motion for summary judgment, asserting that the only notes that he had guaranteed had been paid and discharged.

The district court entered an interlocutory order granting Lanier's motion and granted the FDIC's motion against Whittington, Devlin, and O'Grady as to liability only. Following a bench trial to determine damages, the court granted the FDIC final judgment against the three guarantors for $347,686.51, plus costs, attorneys' fees, and post-judgment interest.

Whittington and O'Grady now appeal. The FDIC has not appealed the judgment denying it relief against Lanier. Whittington and O'Grady challenge only whether they owe any money at all and do not dispute the district court's calculation of the amount still deficient.

## II.

The parties spend the majority of their briefs arguing about whether the federal holder in due course doctrine applies to bar this claim and about who has the burden of proof on the issue of commercial reasonableness. We do not today reach either issue, for we hold that the guarantors had adequate notice of the sale, regardless of the party who carries the burden. Because the bank gave proper notice, all other arguments the parties raise are irrelevant.

■■■ The sole restraints on a seller disposing of collateral pursuant to Tex. Bus. & Comm.Code Ann. § 9.504 (Tex.UCC) is that the disposition be commercially reasonable and that the creditor give the debtor proper notice. *Tanenbaum v. Economics Laboratory, Inc.*, 628 S.W.2d 769, 771 (Tex.1982). Before a creditor can sell the collateral underlying a secured loan, section 9.504(c) requires that the creditor give the debtor "reasonable notification of the time after which any private sale or other intended disposition is to be made." The purpose of this notification is to give the debtor an opportunity to discharge the debt, arrange for a friendly purchaser, or to oversee the sale to see that it is conducted in a commercially reasonable manner. 2 J. White & R. Summers, *Uniform Commercial Code* § 27–12 at 598–99 (3d ed. 1988). Under Texas law, a guarantor also is entitled to notice. *Adams v. Waldrop*, 740 S.W.2d 32, 33 (Tex.App.—El Paso 1987, no writ).

The guarantors challenge the notice given in this case. The notice sent by the bank provided,

[The Bank] will sell the [property] at either a public or private sale ten (10) days after the date of this communication. The Bank fully intends to give reasonable notice of such sale, but circumstances attendant to the property are such that the value of the property threatens to decline speedily, therefore the sale may take place immediately.

Proceeds from such sale shall be applied as provided by Section 9.504, Vernon's Annotated Statutes. There may be a deficiency due and owing the Bank on

the debt after the application of the proceeds.

The guarantors contend that the sale of the inventory for $100,000 was commercially unreasonable because the distributor's cost for the equipment was $500,000 and the dealer's cost approximately $800,000 to $900,000. In addition, the guarantors assert that their notice was defective because the letter sent to them did not state whether the disposition of the collateral would be by public or private sale and because the sale took place four months, rather than ten days, after the letter was sent. Finally, the guarantors aver that the letter did not purport to be the notice of a sale and, owing to its failure to identify the guaranty or to notify the addressee of his status as a debtor personally liable for any deficiency, did not give the guarantors adequate notice of their obligations following a section 9.504(c) sale. We reject each of these contentions and hold that the guarantors received adequate notice under section 9.504(c).

■ Although the goods were sold at a private sale, the bank's letter did not indicate the type of sale at which the goods would be sold. This was not a fatal defect. We follow the lead of the Texas courts in rejecting this as a reason to declare the notice inadequate. As one such court has stated,

> We are aware of decisions by courts in other states that have held that the notice of intent to sell or otherwise dispose of collateral must state whether the sale is to be private or public. *See, e.g., General Motors Acceptance Corp. v. Carter,* 290 S.C. 216, 349 S.E.2d 342 (S.C.Ct.App. 1986). However, § 9.504(c) does not so require. We hold the evidence was sufficient to establish the [collateral] was sold by private sale. As such, the Notice of Intent to Sell did not need to state the time and place of sale.

*Hall v. Crocker Equip. Leasing, Inc.,* 737 S.W.2d 1, 3 (Tex.App.—Houston [14th

Dist.] 1987, writ denied). Because the notice sent by the bank was adequate to "inform reasonable business persons" that their property would be sold within ten days or more, *Siboney Corp. v. Chicago Pneumatic Tool Co.,* 572 S.W.2d 4, 6 (Tex. Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.), the notice was sufficient to allow the bank to proceed with its planned sale of the goods. The notice is not defective simply because it does not specifically state that the goods would be sold privately.[1]

■ The guarantors also argue that their notice was invalid because the sale took place four months, rather than ten days, after the letter was sent. This argument ignores the different treatment that Texas law affords creditors who proceed by private rather than public sale. While section 9.504 provides that a secured creditor must provide both the time and place of any public sale, to allow the debtor the chance to show up at the public sale, the requirements for a private sale are less stringent. For a private sale, the creditor only need provide notice "of the time *after which* any private sale or other intended disposition is to be made." § 9.504(c) (emphasis added). The commentary to this section provides that " '[r]easonable notification' is not defined in this Article; at a *minimum* it must be sent in such time that persons entitled to receive it will have sufficient time to take appropriate steps to protect their interests by taking part in the sale or other disposition if they so desire." *Id.,* comment 5 (emphasis added).

The only reference to the specific timing of a sale is to that of certain consumer goods, which the code commentary suggests should be sold within ninety days. *Id.,* comment 6. As for other goods, "no period is set within which the disposition must be made." *Id.* The clear intent of the code and the commentary is to avoid sales that occur too soon after notice is sent, giving the debtor insufficient time to participate in the sale.[2]

---

1. Our analysis is premised upon the final sale's being private, for § 9.504(c) specifically provides that a secured creditor must provide both the time and place of any public sale.

2. This also is the intent of the security agreement in this case, which provides for a minimum notice of five days.

■ Although it is possible that a sale conducted much later than the time indicated would become stale, we agree with the leading commentators and cases that "generally allow substantial lapses of time between original notice and subsequent private sales." 2 J. White & R. Summers, *supra*, § 27–12 at 606 (citing cases allowing private sales occurring as much as sixteen months after notice sent); *see also id.* § 27–14 at 611 ("A number of cases appear to allow secured creditors a substantial period in which to sell the goods after an initial notice to the debtor."). We believe that a Texas court would find that the sale of collateral four months after notification of the debtor was not so untimely as to mandate a finding that the creditor was required to renotify the debtor of the planned disposition.

■ The guarantors also dispute that they were sent any notice at all, as the letter refers to the possibility of the bank's sending further notice of the impending sale, if possible. Reading the letter as a whole, however, it is evident that the bank, by using the words "will sell," intended to tell the debtors exactly that: that it would sell the inventory after ten days had passed. The following sentence, which refers to the possibility of the bank's sending additional notice, indicated that the bank might provide more specific notice later. However, as we already have discussed, the bank was not required to send this supplemental notice, and its reference to the possibility that it might did not impose that obligation upon it.

We again agree with the White and Summers treatise that "[n]othing in the Code requires the creditor to notify the debtor again every time a possible private sale nears fruition." *Id.* § 27–12 at 605. We thus hold that the letter constituted sufficient notice, and we disregard the guarantors' somewhat implausible implication that the letter only was a pre-notice, communicating the bank's intent to send another notice at some time in the future.

■ The guarantors also contend that the notice sent to them was defective because it failed to identify the addressee as a debtor who would personally be liable for any deficiency. The guarantors observe that this defect would be fatal in Nebraska. *E.g., American Honda Fin. Corp. v. Bennett*, 232 Neb. 21, 439 N.W.2d 459, 462 (1989).

Neither our research nor any law cited by either of the parties indicates that this is the current law in Texas, and we decline to read it into the law of Texas now, absent any showing that the Texas courts would embrace this position. The law in Texas is that a creditor seeking to arrange a section 9.504 disposition of collateral must give notice, but such notice need not indicate all rights and liabilities of the debtor. *Siboney*, 572 S.W.2d at 6. We understand Texas law to require that the letter be read in conjunction with other documents signed by the debtor, construed in light of the Texas Uniform Commercial Code, especially considering that the letter sent by the bank in this case specifically mentioned section 9.504.

Under section 9.504(b), the debtor remains liable for any deficiencies, and the security agreement, contracted under Texas law, explicitly incorporated this provision. The security agreement governing the D–1 note provides in item VI that the debtor is responsible for any deficiency, and the letter sent by the bank states that "[t]here may be a deficiency due and owing the Bank on the debt after the application of the proceeds."

No reasonable investor would expect that he could walk away from a default without regard as to whether the secured creditor had been reimbursed for the entire outstanding amount of the loan, especially in light of the bank's letter and the words of the security agreement. The guarantors would have us require the bank to notify them more explicitly of something that they should have known from reading the law, rereading the original contract, or by consulting common sense. Under these circumstances, the failure of the bank to use the words "personally liable" is not fatal to the FDIC's case.

■ Finally, the guarantors contest the commercial reasonableness of the private sale because it yielded less than the distributor's or dealer's cost of the inventory. Texas appellate courts are split as to where the burden of proof resides on the issue of commercial reasonableness. Even assuming, however, that "the burden of proving that the sale was conducted in a commercially reasonable manner was on the appellee as the secured party," *Hall,* 737 S.W.2d at 3, the FDIC still can recover the deficiency.

The private sale that occurred in this case yielded $100,000, an amount that was $400,000 less than the distributor's cost of the equipment and approximately $80,000—$150,000 less than the amount that Joe Reeves, an independent distributor, alleged in an affidavit that he would have been willing to pay for the same equipment.[3] We hold, however, that this deficiency is not sufficiently large to overturn the district court's decision that the sale was not commercially unreasonable.

■ The Texas Uniform Commercial Code states that

[t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party ... has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

Tex.Bus. & Com.Code Ann. § 9.507(b) (Vernon Supp.1991). While it is true that this language alone does not completely undercut the guarantors' position, Texas law states that the "[m]ere inadequacy of consideration alone does not render a foreclosure void if the sale was legally and fairly made." *Pruske v. National Bank of*

*Commerce,* 533 S.W.2d 931, 937 (Tex.Civ. App.—San Antonio 1976, no writ); *Siboney,* 572 S.W.2d at 8; *accord Kolbo v. Blair,* 379 S.W.2d 125 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n.r.e.).

We also find it compelling that the guarantors can cite affidavits that "establish" the high value of the goods but can bring to light no procedural irregularities that would explain the allegedly low sale price. We agree with the commentators who state that "[c]ourts should have skepticism about hired experts' testimony concerning the value of the collateral, about facile assertions concerning the ease of its resale and the large price that the collateral 'could' bring." 2 J. White & R. Summers, *supra,* § 27–14 at 612.

■ The guarantors bring forth no procedural irregularities, allegations of bad faith, or other reasons to explain the allegedly low sales price. A " 'commercially reasonable' [sale] is ... a sale so conducted as would have been conducted by an ordinary and prudent businessman operating under the same or similar circumstances." *Siboney,* 572 S.W.2d at 6. The sale in this case met this criterion.

Under these circumstances, we decline to infer commercial unreasonableness from what might be a lower-than-expected sales price. So long as the bank took the proper procedural steps, the debtor could have protected its interests by arranging financing for its own or a "friend's" bid or by selling the collateral itself before the bank's foreclosure sale. It did neither. We therefore hold that the bank disposed of its collateral in a commercially reasonable fashion,[4] and we AFFIRM the judgment of the district court.

---

**3.** We need not take this affidavit as true, for it goes solely to the amount of the deficiency, which was decided after a bench trial, unlike the initial summary decision establishing liability.

**4.** The FDIC also requests attorneys' fees, believing that this appeal is frivolous. We do not find, however, that appellants have raised issues so devoid of worth as to merit sanctions.