TEXAS REFRIGERATION SUPPLY, INC., Frank Kologinczak, Bernard Kologinczak and Kolo Refrigeration, Inc., Plaintiffs–Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for First RepublicBank Houston, N.A. and NCNB Texas National Bank, Defendants–Appellees.

No. 90–2850.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1992.

Rehearing Denied April 2, 1992.

Steve A. Bryant, Bryant, Renneker & McLean, Clinard J. Hanby, Essmyer & Hanby, Houston, Tex., for plaintiffs-appellants.

Joseph S. Cohen, Hirsch & Westheimer, Houston, Tex., Carl Morgan, Vickey Dancy, Dallas, Tex., for defendants-appellees.

Before POLITZ, Chief Judge, BROWN, Circuit Judge, and FELDMAN, District Judge.[1]

FELDMAN, District Judge:

The facts of this case tell still another bank-failure story. In resolving the issues by way of summary judgment, the district court was firm in applying the choke hold of *D'Oench, Duhme.* We now review the district court's grant of summary judgment. We affirm in part, vacate in part, and remand for further proceedings.

## I.

Appellants Kolo Refrigeration, Inc. ("Kolo") and Texas Refrigeration Supply, Inc. ("TRS") started a credit relationship with RepublicBank Spring Branch, N.A.

---

1. District Judge of the Eastern District of Louisiana, sitting by designation.

("RBSB") in 1982. In July of that year, appellants Frank and Bernard Kologinczak signed agreements guaranteeing all of TRS's existing and future debts. Nearly two years later the Kologinczaks also guaranteed Kolo's debts.

By late 1984, Kolo had developed an oil extracting process, and entered into four process contracts. Frank Kologinczak sought out RBSB for financing for the contracts, and appellants insist that bank representatives orally agreed to finance the project on January 4, 1985. They urge that Kolo, relying on the bank's promise, went ahead with production, spent large sums of money, and did not search for other ways to finance the project. Appellants say that RBSB repeatedly reassured Kolo that the loans would be made. They were not. In the early summer of 1985, the bank told Kolo that it would not finance the project because it was no longer making energy-related loans.

Earlier in 1985, Kolo had made two loans unrelated to the process contracts: one for $150,608.31 and another for $150,000. Also, the Kologinczaks had borrowed $84,000 and secured that loan with a Cessna airplane. All of these loans are in default, as is a large TRS loan. Kolo is bankrupt.

TRS was also an active borrower. TRS had established a revolving line of credit with RBSB for $250,000, and secured the loan with its inventory. Either after TRS defaulted on the loan and RBSB accelerated the note's maturity, or after the loan matured according to its terms (this is hotly disputed on appeal), RBSB provoked a foreclosure sale and disposed of TRS's entire inventory for the disappointing sum of $20,000. Frank Kologinczak had notice of the sale.

These involved dealings prompted appellants to sue RBSB in Texas state court for breach of contract, negligence, wrongful acceleration, breach of fiduciary duty,

promissory estoppel, misrepresentation, breach of good faith, and deceptive trade practices. RBSB predictably counterclaimed to recover the amounts due on the four loans. Then RBSB found itself in financial trouble, and we confront an even more cluttered terrain.

On December 31, 1987, RBSB was merged into First RepublicBank Houston, N.A. ("FRB Houston"), but a few months later FRB Houston was declared insolvent and closed by the Comptroller of the Currency. The FDIC was appointed receiver under 12 U.S.C. §§ 191 and 1821(c). The FDIC then organized JRB Bank, N.A. ("JRB") as a bridge bank under 12 U.S.C. § 1821(n)(1)(A). JRB changed its name to NCNB Texas National Bank ("NCNB"), and the FDIC entered into a Purchase and Assumption Agreement with NCNB to transfer FRB Houston's assets and certain of its liabilities to NCNB. The FDIC and NCNB, successor to the original bridge bank, removed this case to federal court under 12 U.S.C. § 1819(b)(2).[2] They immediately called upon *D'Oench, Duhme* to avoid the claims asserted.

The district court granted summary judgment in favor of the FDIC and NCNB, dismissing all of the appellants' affirmative claims, and similarly granted NCNB's counterclaims for recovery on the notes. The district court said that all the appellants' claims and defenses were based on unrecorded oral agreements between the appellants and RBSB. Thus, said the court, *D'Oench, Duhme* barred the affirmative claims and appellants' defenses to the notes. We review that holding and sort out whether *D'Oench, Duhme* was applied too rigorously.

## II.

■ Courts and Congress have built on the Supreme Court's controversial decision in *D'Oench, Duhme & Co. v. FDIC*, 315

---

**2.** Section 1819(b)(2) provides, in part:

(A) In general
Except as provided in subparagraph (D), all suits of a civil nature at common law or in equity to which the Corporation, in any capacity, is a party shall be deemed to arise under the laws of the United States.

(B) Removal
Except as provided in subparagraph (D), the Corporation may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court.

U.S. 447, 62 S.Ct. 676, 86 L.Ed.2d 956 (1942) to develop the body of law that now instructs that one who has dealt with a failed FDIC-insured institution may not assert a claim or defense against the FDIC that depends on some understanding that is not reflected in the insolvent bank's records. *See, e.g., Bowen v. Federal Deposit Insurance Corporation,* 915 F.2d 1013, 1015–16 (5 Cir.1990); *Beighley v. Federal Deposit Insurance Corp.,* 868 F.2d 776, 783–84 (5 Cir.1989); 12 U.S.C. § 1823(e).[3] Section 1823(e), the statutory result of *D'Oench, Duhme* and its progeny, specifically directs that agreements with failed banks are unenforceable against the FDIC unless they meet four formal non-secrecy requirements.[4] The accessibility of the agreement is the doctrinal underpinning. In other words, any "transactions not reflected on the bank's books do not appear on the judicial radar screen either." *Bowen, supra,* at 1016.

■ At least two articulated policies support this broad, and, at times, arguably harsh rule. *D'Oench, Duhme* favors the interests of depositors and creditors of federally insured banks (who cannot protect themselves from unwritten accords) over the interests of borrowers, to whom such agreements are presumably accessible. *See Kilpatrick, supra,* at 1529. Ease of understanding a bank's financial health is an equally important reason. We have recognized that *D'Oench, Duhme* "ensure[s] that FDIC examiners can accurately assess the condition of a bank based on its books." *Bowen, supra,* at 1016. Simply put, oversight agencies should not bear too great a burden in getting their information. Because of the doctrine, the government need not research and compile extensive parol evidence, including inherently unreliable oral histories, to determine a bank's unrecorded liabilities. *Id.*

Congress has played a conspicuous role in reaffirming and broadening the doctrine. In the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 Congress codified the case literature that extended *D'Oench, Duhme* protection to so-called "bridge banks."[5] *See* 12 U.S.C. § 1821(n)(4)(I); *Kilpatrick, supra,* at 1528; *Bell & Murphy & Associates, Inc. v. Interfirst Bank Gateway, N.A.,* 894 F.2d 750, 754 (5 Cir.) *cert. denied, Bell & Murphy & Associates, Inc. v. Federal Deposit Insur-*

---

**3.** Although there are really two *D'Oench, Duhme* doctrines, one common law and one statutory, this distinction is not important. Until recently, the statutory doctrine did not protect the FDIC when it acted as receiver of a failed bank (although the common law doctrine did apply to the FDIC receiver). *See Beighley, supra,* at 783. However, on August 9, 1989, Congress amended § 1823(e), making it available to the FDIC as receiver. *See* 12 U.S.C. § 1823(e).

The case before us was filed prior to the amendment and involves the FDIC as receiver. However, we need not decide whether the change applies here. We have long held that the statutory and common law *D'Oench, Duhme* doctrines bar essentially the same claims and defenses; that is, they are virtually interchangeable. *See Kilpatrick v. Riddle,* 907 F.2d 1523, 1526 n. 4 (5 Cir.1990) (citing cases), *cert. denied sub nom. Rogers v. FDIC,* —— U.S. ——, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991).

**4.** 12 U.S.C. § 1823(e) provides:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

**5.** A bridge bank, like JRB, is an institution organized by the FDIC and chartered by the Comptroller of the Currency to acquire the assets and liabilities of a failed bank. *See* 12 U.S.C. § 1821(n)(1). Here, NCNB Texas, the successor to JRB, was the bridge bank entitled to assume the assets and certain liabilities of FRB Houston.

*ance Corporation,* —— U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). Section 1821(n)(4)(I), in language nearly identical to that of § 1823(e), expressly provides that no agreement that diminishes an asset of a bridge bank is enforceable unless it meets the same non-secrecy requirements mandated by § 1823(e).[6]

▪ This Court has also been rather generous in treating *D'Oench, Duhme,* perhaps not without controversy. For example, we have held that the FDIC may use the *D'Oench, Duhme* shield against a claim or defense based on any unwritten agreement between the insolvent bank and a borrower, even if the agreement is unrelated to a bank asset. *See Bowen, supra,* 915 F.2d at 1015–16. In *Bowen,* we reaffirmed the long reach of *D'Oench, Duhme. Bowen* acknowledged that *D'Oench, Duhme* limited itself to a borrower who attempted to use a secret agreement with a failed bank as a defense in a suit on the note by the FDIC. *Id.* at 1015. But we held that the modern *D'Oench, Duhme* doctrine has been expanded to bar the use of unwritten agreements [7] as the basis of *any* defense or claim against the FDIC, even if the agreement does "not implicate a specific obligation, such as a note or other asset held by the FDIC." *Id.* at 1016.

With these working principles in mind, we turn to the district court's use of *D'Oench, Duhme* to grant summary judgment.

### III.

The district court's grant of summary judgment reflects a particular attraction to the doctrine. The court found that the appellants relied on several unrecorded oral agreements with RBSB to support each and every claim and defense.

▪ We review a decision to grant summary judgment *de novo,* and apply the same standards that instruct the district court. *See Degan v. Ford Motor Company,* 869 F.2d 889, 892 (5 Cir.1989). We will affirm a grant of summary judgment if we find a basis, independent or not of the district court's reasoning, adequate to support the result. *Id.* We may affirm even in situations in which the district court's ruling was incorrect, as long as the result was proper. *Id. See also, Federal Deposit Insurance Corporation v. Laquarta,* 939 F.2d 1231, 1240 (5 Cir.1991) ("[W]e may affirm a summary judgment on a ground not relied upon by the district court.").

### IV.

Appellants argue that *D'Oench, Duhme* does not trump recovery on their claims against the FDIC and NCNB, or bar their defenses against NCNB's counterclaim for payment of the $250,000 loan. They mount two offensives: that RBSB wrongfully accelerated the debt, and that RBSB did not dispose of the collateral in a commercially reasonable way. Appellants remind us that the Texas UCC prohibits creditors from accelerating loans except for good cause [8], and obliges creditors to be commercially reasonable in conducting a foreclosure sale.[9] With enterprise, they argue that rights based on these UCC obligations

---

**6.** The policy that drives the *D'Oench, Duhme* rule in the FDIC context applies equally when a bridge bank is involved as the successor to the FDIC. It would seem important to the stability of the banking industry that the potential purchaser of a failed bank's assets be able to accurately and with some degree of certainty assess the value of the bank's assets and obligations.

**7.** It is irrelevant whether the agreement at issue was illegal, or made with some intent to deceive the banking authorities; any unwritten agreement is ineffective against the FDIC. *See Bowen, supra,* at 1016; *Bell & Murphy, supra,* 894

F.2d at 753; *Beighley, supra,* 868 F.2d at 784 (*D'Oench* applies "even when the borrower does not intend to deceive banking authorities [and even if] the underlying transaction [is not] fraudulent"). Nor is recklessness, or even negligence, required. *See Bowen, supra,* at 1017. Like it or not, this is the present-day character of *D'Oench, Duhme.*

**8.** *See* Tex.Bus. & Comm.Code § 1.208 (Tex. UCC).

**9.** *See* Tex.Bus. & Comm.Code § 9.504(c) (Tex. UCC).

appear on the face of their notes and guarantees because they are inferred as a matter of law in any and every loan agreement. As such, we are told, these claims and defenses are not stricken by *D'Oench, Duhme*. We agree, to a point.[10]

■ *D'Oench, Duhme* does not of itself thwart the assertion of rights for relief from wrongful acceleration and unreasonable sale at foreclosure. *See Garrett v. Commonwealth Mortgage Corporation of America*, 938 F.2d 591, 595 (5 Cir.1991) ("[N]either section 1823(e) nor the *D'Oench, Duhme* doctrine prevents plaintiffs from asserting claims or defenses that *do not depend on agreements.*" (emphasis supplied)). We repeat, *D'Oench, Duhme* only protects the FDIC and federally-created bridge banks from oral agreements that for some reason do not become part of the loan record (usually, oral agreements).

■ Obligations about timely acceleration and the disposal of collateral are implicit in every promissory note. These covenants are inferred in every such loan agreement. *See International Bank, N.A. v. Morales*, 736 S.W.2d 622, 624 (Tex.1987); *Kierstead v. City of San Antonio*, 643 S.W.2d 118, 121 (Tex.1982). And because they are an integral element of the relationship between every borrower and lender, they cannot be said to be secret or unwritten in the *D'Oench, Duhme* sense. We believe the district court applied *D'Oench, Duhme* too rigorously, but our analysis continues because it is necessary to examine the wrongful acceleration claim and the unreasonable foreclosure sale claim separately.

### A.

Appellants insist RBSB violated Texas law by accelerating the $250,000 loan without good cause,[11] even though TRS became technically in default when it failed to provide to RBSB a monthly financial statement, as the note required.

■ Appellees' simple response is that RBSB did not accelerate the note; instead, the bank did not demand full payment until after the note had matured by its terms. That might well be, but they raise this issue for the first time on appeal.[12] Because the record is absolutely silent, we should not and will not take up here

> new grounds raised by an appellee in defense of summary judgment where the parties were not afforded an opportunity to develop the issue below, and it was not implicit or included in the issues or evidence tendered below, so that the party was not on notice of the need to meet it, and the record appears not to be adequately developed in that respect.

*Laguarta, supra,* 939 F.2d at 1240. This issue is not properly before us now.

■ We observe, however, that even if one assumes the bank accelerated the debt's maturity, genuine issues of material fact exist. Texas law emphasizes that acceleration is a harsh remedy, and courts should carefully scrutinize the bank's good faith. *See Davis v. Pletcher*, 727 S.W.2d 29, 35 (Tex.Civ.App. San Antonio (4 Dist.) 1987); *McGowan v. Pasol*, 605 S.W.2d 728 (Tex.Civ.App. Corpus Christi 1980). Good faith is betrayed by "[c]ircumstances which tend to show that the holder has exercised his option to accelerate, not for purposes of preserving his debt or preserving the security therefor, but for the purpose of coercing the maker to pay the then balance remaining unpaid on the note...." *Davis, supra,* at 35–36. We cannot say from the record developed in the district court whether the bank's persistent insistence on

---

10. Notwithstanding the decision in *Lexington Insurance Co. v. Gray*, 775 S.W.2d 679 (Tex.Civ. App. Austin (3 Dist.) 1989), that a variable interest rate affects a promissory note's negotiability, another panel of this Court has certified the question to the Texas Supreme Court and, therefore, we do not comment on the present state of Texas law.

11. Section 1.208 of the Texas UCC provides that if a creditor is authorized to accelerate a debt "at will" or "at his option" he may do so "only if

he in good faith believes that the prospect of payment or performance is impaired." Tex. Bus. & Comm.Code, § 1.208; *see also Brown v. Avemco Investment Corp.*, 603 F.2d 1367, 1378 (9 Cir.1979).

12. In the district court, defendants' motion for summary judgment on the $250,000 note relied only on *D'Oench, Duhme* and the federal holder in due course doctrine. No mention was made of the propriety of the acceleration, or whether acceleration occurred at all.

a monthly financial statement, in the face of TRS's explanation why one couldn't be generated, was done in good faith or not.

The condition of the $250,000 loan that required the debtor to give the bank monthly financial statements is clearly intended to allow the bank to monitor the borrower's financial well-being. TRS blames its failure to produce the financial statement at issue on a computer problem; appellants claim they explained the problem to the bank. They add that in the past RBSB had not insisted on compliance with the disclosure requirement. Two possible implications flow from the record before us. First, it could be that the bank decided to demand the financial statement, although it had not done so in the past, because of legitimate misgivings about the financial state of TRS. On the other hand, the trier of fact could also infer that the bank knew that the default was simply due to a temporary technical problem, but was nevertheless requiring strict compliance to create an excuse to accelerate.

The record is silent as to which of these interpretations is correct. Thus, although the district court correctly applied *D'Oench, Duhme* to the wrongful acceleration issue, the court erred in granting summary judgment on the claim that RBSB acted in bad faith in accelerating the maturity of the $250,000 note.[13] *See Phillips Oil Co. v. OKC Corporation*, 812 F.2d 265, 274, n. 15 (5 Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987) (Summary judgment is improper if the undisputed facts raise conflicting inferences because the choice between competing inferences is for the trier of fact.) Remand is required to resolve two critical fact-driven issues: (1) whether RBSB accelerated the note, and (2) if RBSB did accelerate the note, did the bank do so in bad faith?

**B.**

 We turn now to the foreclosure sale of the inventory. Appellants contend that the district court erred in granting summary judgment dismissing their theory that RBSB unreasonably disposed of the collateral at foreclosure. We agree and reverse the district court. Our earlier discussion in Part IV requires us to conclude that *D'Oench, Duhme* is not a bar to asserting the foreclosure issue. Summary resolution of this issue was also error for another reason.

 We have held that "[t]he sole restraints on a seller disposing of collateral pursuant to Tex.Bus. and Comm.Code ... § 9.504 (Tex. UCC) is that the disposition be commercially reasonable and that the creditor give the debtor proper notice." *Federal Deposit Insurance Corporation v. Lanier*, 926 F.2d 462, 464 (5 Cir.1991) (citing *Tanenbaum v. Economics Laboratory, Inc.*, 628 S.W.2d 769, 771 (Tex. 1982)). In Texas law, a debtor on a secured note has been put to the burden of proving that the foreclosure sale was unreasonable (although some Texas cases have split on this, we need not dwell on that here). *See Tarrant Savings Association v. Lucky Homes, Inc.*, 390 S.W.2d 473, 474, 475 (Tex.1965); *Sumitomo Bank of California v. Product Promotions, Inc.*, 717 F.2d 215, 219 (5 Cir.1983). Summary judgment was not proper on the foreclosure issue because the record reflects a material fact dispute as to the unreasonableness of the foreclosure sale. Appellees rely heavily on *Lanier* to convince us no fact dispute exists. We are unconvinced.

In *Lanier*, we broadly noted that under Texas law proof that the price realized at a foreclosure sale was less than the value the debtor could establish for the goods, even if the foreclosure price was below cost, is not alone sufficient to establish that a foreclosure sale was commercially unreasonable. *See Lanier, supra,* at 467 (citing

---

**13.** Both the district court and the appellees apparently conclude that the only evidence of RBSB's bad faith is an oral agreement that it would not accelerate the maturity of TRS's loan. In our review of the record, we discovered no evidence of such an understanding. However, if such an accord was reached, it could not be asserted as a bad faith acceleration because it would be undercut by the *D'Oench, Duhme* doctrine. *Any* claim or defense predicated on an oral agreement with a failed bank is ineffective against the FDIC as receiver and, likewise, against NCNB as the bridge bank assignee of the FDIC. *See Bowen, supra,* 915 F.2d at 1015–16; *Kilpatrick, supra,* 907 F.2d at 1528.

*Pruske v. National Bank of Commerce,* 533 S.W.2d 931, 937 (Tex.Civ.App. San Antonio 1976)). We declined "to infer commercial unreasonableness from what might be a lower-than-expected sales price." *Lanier, supra,* at 467. Rather, to establish wrongful foreclosure under Texas law, we observed that the plaintiff must be able to point to "procedural irregularities [in the sale], allegations of bad faith, or other reasons to explain the allegedly low sales price." *Id.* We do not quarrel with what we said in *Lanier,* but we do not see *Lanier* as commanding that the district court's grant of summary judgment was correct. *Lanier's* facts differ vastly from those established, and those still unresolved, in this case.

The record is clear: the market value of TRS's collateral was at least $200,000, and RBSB could have definitely disposed of a portion of the inventory for more than $80,-000.[14] The inventory was sold for $20,000. In contrast, the price that might have been obtained in *Lanier* was not fixed; it was the subject of mere speculation and we were unwilling to anchor our decision to speculation about higher values. RBSB points to a higher value with specificity that eludes *Lanier.* We cannot reject proof of a fixed order that would bring in far more money. And we are not able to say that, as a matter of law, sale of all the security for only $20,000 in the face of a valid order to buy only a part of the collateral for over $80,000 was a commercially reasonable disposition of the collateral. We leave that issue for the fact-finder at trial.

### V.

■ We are left with incidental issues that the district court properly resolved: RBSB said it would finance Kolo's new extracting process, but didn't. RBSB promised to apply TRS receivables to finance TRS; it didn't (the receivables collected went to debt reduction). It is these promises which support appellants' claims for breach of contract, negligence, beach of fiduciary duty, promissory estoppel, misrepresentation, breach of good faith, and deceptive trade practices.

The district court correctly held that all these claims depend upon one or more oral agreements with RBSB. The district court applied *D'Oench, Duhme* and barred these claims. *See Bowen, supra,* 915 F.2d at 1015–16. Each such agreement clearly amounted to an oral promise by the bank to do something regarding credit for appellants. *D'Oench, Duhme* unequivocally bars enforcement of unwritten promises by failed banks to extend future credit. *See Id.* at 1016; *Beighley, supra,* 868 F.2d at 784; *Federal Savings and Loan Insurance Corporation v. Murray,* 853 F.2d 1251, 1255 (5 Cir.1988).

We are not persuaded that appellants' arguments help them escape *D'Oench, Duhme's* bar.[15]

### A.

■ Their most appealing argument is that NCNB, in the Purchase and Assumption Agreement, assumed FRB Houston's obligations on appellants' lender liability claims,[16] and waived any *D'Oench, Duhme* defenses to these claims. Appellants invoke Section 2.1(k) of the Agreement by which NCNB assumed:

such other non-subordinated liabilities as shall be certified by the Receiver to have constituted valid and enforceable obligations of the Failed Bank, including liabilities for any disputed claims or liti-

---

**14.** The summary judgment evidence consists of the affidavit of Frank Kologinczak. In it, he states that some of the inventory pledged as collateral was subject to an outstanding order at a purchase price of $89,000. He says that RBSB refused to fill this order before selling all of the inventory at the foreclosure sale.

**15.** Their first argument must be quickly dismissed. They urge us to reconsider holdings such as *Bowen, Bell & Murphy* and *Beighley* extending *D'Oench, Duhme* protection to *all* oral agreements of the failed bank, including contractual obligations unrelated to any asset of the failed bank. But one panel of this Court cannot overrule another; only the United States Supreme Court or our en banc Court can overturn our precedent.

**16.** Ordinarily, the FDIC is the sole proper defendant to claims of wrongdoing against an insolvent bank. *See Pernie Bailey Drilling Company v. Federal Deposit Insurance Corporation,* 905 F.2d 78, 80 (5 Cir.1990); *Beighley, supra,* 868 F.2d at 779–80, n. 7.

gation brought against the Failed Bank by third parties and not related to any asset of the Failed Bank purchased by the Assuming Bank. . . .

Appellants stress that the P & A Agreement further specifies that NCNB assumes these liabilities "whether or not they are reflected on the books of the Failed Bank as of Bank Closing." Appellants believe that Section 2.1(k) transfers to NCNB the liability for their claims of wrongdoing against FRB Houston, and that it indicates that NCNB intended to assume the specified liabilities free of any *D'Oench, Duhme* defense.

But the plain language of the P & A Agreement says that NCNB did not assume liability for the claims against FRB Houston. Section 2.1(k) does not unqualifiedly transfer to NCNB all disputed claims or litigation against the insolvent bank. Rather, the agreement dictates that NCNB only assumed liability for claims certified as valid by the FDIC. FDIC never certified as valid the appellants' claims.

Section 2.1(k) permits the FDIC to pass on certain liabilities to the bridge bank if the FDIC determines that the claims are proved to its satisfaction; alternatively, the FDIC can withhold those claims that are not proved and handle them itself.[17] For the FDIC to assume such a role is not prohibited, and, indeed, even seems to have the Supreme Court's blessing. *See Coit Independent Joint Venture v. FSLIC*, 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989).

### B.

■ Finally, appellants' last effort says it was error for the district court to reject their attempts to recover on the lender liability claims by suing for a *pro rata* share of the failed bank's assets under 12 U.S.C. § 194. Plaintiffs believe they have a statutory right to proceed against the assets of the failed bank.[18] They seek the comfort of *Campbell Leasing, Inc. v. Federal Deposit Insurance Corporation*, 901 F.2d 1244 (5 Cir.1990). We do not read *Campbell Leasing* their way.

In *Campbell Leasing* we reversed the district court's grant of summary judgment and we held that the debtor had the right to sue FDIC as receiver to recover on asserted claims not based on oral agreements. *Id.* at 1249. *Campbell Leasing* does not instruct us because none of the tort claims remaining at issue were based on oral agreements with the insolvent bank. *Id.* at 1247–49. Here, all of appellants' claims (except the wrongful acceleration and unreasonable sale at foreclosure claims) depend on breaches of oral agreements.

### VI.

Accordingly, we vacate that part of the district court's judgment dismissing the appellants' claim based on RBSB's wrongful acceleration of the note and unreasonable disposition of the collateral, and we remand for further proceedings consistent with this opinion. We affirm the district court in all other respects.

---

**17.** This makes sense, given the policy underlying the creation of the FDIC (and, for that matter, the policy underlying *D'Oench, Duhme*) to ensure continued stability in the banking system. This way, the bridge bank is only responsible for obligations with a firm grounding in fact, and which are capable of reasonable determination from the records of the bank. If complicated litigation is necessary, the FDIC takes care of it, rather than imposing it upon the newly created institution.

**18.** Section 194 provides that "[f]rom time to time . . . the comptroller shall make a ratable dividend of the money . . . paid over to him by [the] receiver on all such claims as have been proved to his satisfaction or adjudicated in a court of competent jurisdiction. . . ."