# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-60166
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

October 3, 2016

Lyle W. Cayce
Clerk

C&C INVESTMENT PROPERTIES, L.L.C.; GLEN L. COLLINS,

    Plaintiffs - Appellants

v.

TRUSTMARK NATIONAL BANK,

    Defendant-Third Party Plaintiff - Appellee

v.

CHARLOTTE D. COLLINS

    Third Party Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before KING, DENNIS, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

At the height of the savings & loan crisis, we considered a number of cases involving the *D'Oench, Duhme* doctrine. *See, e.g.*, *Resolution Trust Corp. v. Murray*, 935 F.2d 89 (5th Cir. 1991); *Fed. Sav. & Loan Ins. Corp. v. Cribbs,* 918 F.2d 557 (5th Cir. 1990); *Fed. Sav. & Loan Ins. Corp. v. Murray*, 853 F.2d 1251 (5th Cir. 1988). That doctrine, which originated in the federal common

law and is now codified at 12 U.S.C. § 1823(e), prevents borrowers from relying on oral agreements they allegedly had with a failed bank to defend against collection efforts of a federal receiver like the Federal Deposit Insurance Corporation (FDIC). *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 459–60 (1942). The failure of a Mississippi bank in the aftermath of the 2008 financial crisis[1] requires us to again consider the doctrine.

## I.

In 2004, Glen and Charlotte Collins formed C&C Investment Properties, LLC to buy, rent, and flip real estate. Between 2006 and 2009, C&C bought several foreclosed properties from Heritage Banking Group. C&C financed these purchases through promissory notes payable to Heritage, which were secured by deeds of trust encumbering the properties and guaranteed personally by the Collinses. According to the Collinses, the purchases were subject to the following side agreement: C&C would pay Heritage amounts equal to what Heritage paid for the properties at foreclosure and Heritage would later refinance the properties to account for their renovation value.

C&C stopped making payments on the loans because Heritage purportedly did not live up to the side agreement. As a result, it defaulted on the notes and guaranties. In response, Heritage foreclosed on the properties. Aggrieved, Glen Collins and C&C sued Heritage for breach of contract and fraudulent inducement.

While the suit was pending, Heritage was declared insolvent and the FDIC was appointed as receiver. That same day, the FDIC entered into a Purchase and Assumption Agreement with Trustmark National Bank, under

---

[1] More than four hundred FDIC-insured banks failed from 2008–2012. Only ten had failed in the five years prior to 2008. *See FDIC: Failed Bank List*, FEDERAL DEPOSIT INSURANCE CORPORATION, https://www.fdic.gov/bank/individual/failed/banklist.html (last updated Sept. 15, 2016).

No. 16-60166

which it transferred to Trustmark various Heritage assets and liabilities, including the C&C notes and guaranties.

Upon being substituted for Heritage as a defendant, the FDIC moved to dismiss the case. Before the court could rule on the motion, however, Mr. Collins and C&C sought and obtained leave to amend, adding Trustmark as a defendant. The FDIC thereafter renewed its motion, which was granted.

Once added as a party, Trustmark pleaded section 1823(e) as a defense and filed counterclaims against C&C and the Collinses (hereafter referred to jointly as the "borrowers") for the amount still owing on the notes. Trustmark also sought reimbursement for its costs and expenses related to collection and enforcement of the loans.

Trustmark filed a motion for summary judgment, arguing that because the claims against it and the defenses to its counterclaims are based on an unwritten side agreement between C&C and Heritage, section 1823(e) bars them. The borrowers objected, asserting that Trustmark either affirmatively or by being dilatory waived this defense. They further argued that, even if there was no waiver, there is a material fact dispute about whether the side agreement exists in a written form sufficient to overcome section 1823(e). The district court granted Trustmark's motion.

## II.

We review a summary judgment ruling de novo. *Davis v. Fort Bend Cty.*, 765 F.3d 480, 484 (5th Cir. 2014). We interpret all facts and draw all reasonable inferences in favor of the nonmovant. *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013). Summary judgment is appropriate only when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

*D'Oench, Duhme* bars parties from "rely[ing] on an oral agreement

3

No. 16-60166

between [a failed bank and its customer] as the basis for defenses or claims against the FDIC." *Lemaire v. FDIC*, 20 F.3d 654, 657 (5th Cir. 1994). Enacted in 1950, not long after the Supreme Court decided *D'Oench, Duhme*, section 1823(e) codifies that common law ruling. *Bowen v. FDIC*, 915 F.2d 1013, 1015 n.3 (5th Cir. 1990). The statute provides that any "agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section" shall not "be valid against the [FDIC] unless such agreement" is: (1) in writing; (2) contemporaneously executed by the depository institution and the person claiming an adverse interest; (3) approved by the board of directors of the depository institution and reflected in the minutes of the board; and (4) continuously, from the time of its execution, an official record of the depository institution. 12 U.S.C. § 1823(e)(1). We have extended these protections to private parties, like Trustmark, that purchase the assets of insolvent banks from the FDIC. *Porras v. Petroplex Sav. Ass'n*, 903 F.2d 379, 381 (5th Cir. 1990).

There are two reasons for the *D'Oench, Duhme* rule. First, it "allow[s] federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets." *Langley v. FDIC,* 484 U.S. 86, 91 (1987). Second, it "ensure[s] mature consideration of unusual loan transactions by senior bank officials, and prevent[s] fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." *Id.* at 92.

The borrowers do not dispute these general principles of section 1823(e) or their applicability to this case. Instead, they attempt to avoid the defense in three ways. The first two involve waiver, as the borrowers contend that Trustmark substantively waived the defense in its agreement for the purchase of the Heritage assets and also procedurally waived the defense by asserting it too late in this lawsuit.

4

No. 16-60166

An affirmative waiver occurs when a party voluntarily or intentionally surrenders a known right. *Salzstein v. Bekins Van Lines Inc.*, 993 F.2d 1187, 1191 (5th Cir. 1993). The borrowers maintain that Trustmark, through Section 2.1(n) of its Purchase and Assumption Agreement with the FDIC, did just that. Section 2.1(n) states:

> The Assuming Institution expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the following liabilities of the Failed Bank as of the Bank Closing Date, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed");
> . . .
>
> (n) all asset-related offensive litigation liabilities and all asset-related defensive litigation liabilities, but only to the extent such liabilities relate to assets subject to a Shared-Loss Agreement, and provided that all other defensive litigation and any class actions with respect to credit card business are retained by the Receiver.

This language, the borrowers assert, makes clear that Trustmark assumed liability on the subject loans free of any section 1823(e) defense. We disagree.

Our sole case dealing with affirmative waivers in this context suggests the borrowers have not made a sufficient showing. In *Tex. Refrigeration Supply, Inc. v. FDIC*, 953 F.2d 975 (5th Cir. 1992), we remarked that the borrowers' "most appealing argument" was that a purchaser of failed bank assets "waived any *D'Oench, Duhme* defenses to [the] claims [against it]" through its "Purchase and Assumption Agreement" with the FDIC. 953 F.2d at 983–84. That agreement stated, in pertinent part, that the purchaser assumed certain "liabilities as shall be certified by the Receiver . . . *whether or not they [we]re reflected on the books of the Failed Bank* as of Bank Closing." *Id.* (emphasis added) (internal quotation marks omitted). The borrowers argued that purchasing the assets irrespective of whether they were recorded on the books of the failed bank waived the *D'Oench, Duhme* rule that only

5

recorded agreements are enforceable.  We found no waiver without having to interpret this provision, however, relying instead on the provision stating that the lender only assumed liability for claims certified as valid by the FDIC, which had not been done for the claims being asserted.  *Id.*

Unlike the agreement in *Texas Refrigeration*, Trustmark's agreement with the FDIC makes no mention of liabilities not reflected on the books of the failed bank.  It merely addresses which Heritage asset-related litigation liabilities, assumed by the FDIC, were transferred to Trustmark.  Nothing about it expressly or impliedly indicates a voluntary or intentional surrender by Trustmark of the section 1823(e) defense it inherited from the FDIC.

We also reject the borrowers' assertion that Trustmark waived this defense by raising it in a dilatory manner.  Even when a party has failed to assert an affirmative defense in its answer, we may allow it to assert the defense "if it is raised at a pragmatically sufficient time and [the plaintiff] was not prejudiced in its ability to respond."  *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 610 (5th Cir. 2007) (alteration in original) (internal quotations omitted); *see also Rogers v. McDorman*, 521 F.3d 381, 386–87 (5th Cir. 2008) (finding no unfair surprise when, despite the defense not being pleaded, plaintiffs had notice in light of it being alluded to in the answer and a pretrial brief, as well as during a pretrial hearing); *Standard Waste Sys. Ltd. v. Mid-Continent Cas. Co.*, 612 F.3d 394, 398–99 (5th Cir. 2010) (finding the failure to plead an affirmative defense did not result in unfair surprise when defendant expressly mentioned it in denial letters, a joint status report, and the expert witness designation list).

Unlike the defendants in the cases just cited, Trustmark raised its section 1823(e) defense in its answer so there is no basis for the borrowers to argue unfair surprise.  Indeed, they don't do so.  Instead, they argue Trustmark

was required to include the defense in a Rule 12 motion to dismiss, like the FDIC did.  Trustmark's failure to do so, according to the borrowers, caused an unnecessary continuation of the litigation that should preclude it from asserting the defense at the summary judgment stage.

This argument reveals a basic misunderstanding of the rules of civil procedure.  Rule 12(b)(6) provides a means by which a defendant may seek to dismiss a claim at the pleading stage; it does not require that a defense be asserted through that procedure.  FED. R. CIV. P. 12(b) ("Every defense to a claim for relief must be asserted in the responsive pleading if one is required.  But a party *may* assert the following defenses by motion . . . (6) failure to state a claim upon which relief can be granted." (emphasis added)); FED. R. CIV. P. 12(h)(1) (omitting a Rule 12(b)(6) defense from the defenses that may be subject to waiver by failure to assert at the Rule 12 stage).  Rule 12 expressly provides that a defendant not pursuing a Rule 12(b)(6) defense at the pleading stage may raise it later in the litigation, including at trial.  FED. R. CIV. P. 12(h)(2)(C) (stating that "failure to state a claim upon which relief can be granted . . . may be raised . . . at trial").  And it is common that affirmative defenses sometimes raised in Rule 12(b)(6) motions, take a limitations defense as but one example, may also be raised via a summary judgment motion.  *See e.g.*, *FDIC v. Dawson*, 4 F.3d 1303, 1306 (5th Cir. 1993).  One obvious reason a defendant may wait is that a Rule 12(b)(6) motion typically cannot rely on evidence outside the complaint.  *See Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).  But even when there is no apparent reason for doing so, the rules allow a defendant to assert an affirmative defense that may have been suitable for Rule 12(b)(6) disposition at the summary judgment stage.

As for the efficiency concerns the borrowers raise, a plaintiff desiring early resolution of an affirmative defense may seek to strike it under Federal

Rule of Civil Procedure 12(f). *See* 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1381 (3d. ed. 2004) (explaining that the "insufficient defense" language in Rule 12(f) had been read to allow a challenge to the legal sufficiency of an affirmative defense). Or the parties can agree to file an early summary judgment motion without the need for full discovery. But there is nothing that barred Trustmark from pursuing the section 1823(e) defense, asserted in its answer, at the summary judgment stage after discovery concluded.

Apart from their unsuccessful waiver arguments, the borrowers argue that a material fact dispute exists that should have precluded summary judgment: whether the side agreement is in a written form sufficient to overcome section 1823(e). They point to the testimony of a Heritage division president who, when asked whether something in writing described the arrangement between C&C and Heritage, replied, "there may have been—well, I would have . . . gotten—and I can't remember whether it was an e-mail or something from Tim Leitaker saying it was okay for me to do that." The executive was then asked whether there was something in writing other than the email, to which he replied, "I don't remember the exact communication, but, yeah . . . I guess I'm positive that it was communicated in writing. If not, it still had to be signed off on every time I turned a loan in for it."

Even viewing the executive's testimony about the purported side agreement in favor of the borrowers, there is no evidence from which a jury might conclude that all of the conditions necessary to overcome section 1823(e) are present. At most, the statements are evidence of communications describing the purported side agreement. We have doubts whether such writings would meet even the first requirement: that the "agreement" itself be in writing—not other communications referring to it. 12 U.S.C. § 1823(e)(1)(A).

No. 16-60166

That the agreement be in writing, however, is only one requirement of section 1823(e). The written agreement must also meet the three other non-secrecy requirements. 12 U.S.C. § 1823 (e)(1)(B)–(D). The bank executive does not state that the communication was signed by Heritage and the borrowers, approved by Heritage's Board of Directors, or continuously kept as an official Heritage record. Nor do the borrowers point to any other evidence supporting these additional statutory requirements. *See Resolution Trust Corp. v. McCrory*, 951 F.2d 68, 72 (5th Cir. 1992) (holding that a copy of an agreement executed by an insolvent bank found in the draft documents of the bank's attorney did not satisfy section 1823(e)'s requirements because it was not an official record of the failed bank); *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 383–84 (11th Cir. 1991) (holding that a written form, despite outlining the obligations of both parties and existing in the insolvent bank's records, did not meet section 1823(e)'s requirements because it had not been executed by the failed bank); *FDIC v. Gardner*, 606 F. Supp. 1484, 1488 (S.D. Miss. 1985) (finding that a written agreement executed by a failed bank president could not be enforced against the FDIC because it was not specifically approved by the board).

\* \* \*

The judgment of the district court is AFFIRMED.