**James N. and Betty G. BOWEN, Plaintiffs–Appellees,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First RepublicBank—El Paso, Defendant–Appellant.**

No. 89–1740.

United States Court of Appeals, Fifth Circuit.

Oct. 31, 1990.

T. Ray Guy, Hardin R. Ramey, Will S. Montgomery, Dallas, Tex., for defendant-appellant.

E. Link Beck, El Paso, Tex., for plaintiffs-appellees.

Before GOLDBERG, GEE and WILLIAMS, Circuit Judges.

GOLDBERG, Circuit Judge:

The Federal Deposit Insurance Corporation (the "FDIC" or "Corporation"), as receiver for First RepublicBank—El Paso ("the Bank"), appeals from a $403,793 judgment in favor of James and Betty Bowen. The Bowens allege that the Bank reneged

on a loan officer's oral promise to extend a loan to their firm, Bowen Industries, Inc. ("BII"). As a result of the Bank's failure to make the loan, which was intended to enable BII to pay delinquent payroll taxes, the IRS assessed the Bowens personally, leading to the damages they claim here. The Bowens' claims against the Bank are premised on promissory estoppel; breach of fiduciary duty and the duty of good faith and fair dealing; and constructive fraud. We find that the claims are defeated by the *D'Oench, Duhme* doctrine, which bars the use of unrecorded agreements as the basis for claims or defenses against the FDIC. Accordingly, we reverse, and render judgment for the FDIC.

## I. Facts and Prior Proceedings [1]

BII was a contracting firm whose principal shareholders and officers were James and Betty Bowen, a married couple. Mr. Bowen, founder of a BII predecessor in 1962, managed the firm's operations, while Mrs. Bowen handled the bookkeeping. The Bank provided loans and other banking services to BII.

By the early 1980's, BII was in poor financial shape. The firm owed the Bank about one million dollars on six-month renewable notes personally guaranteed by the Bowens. BII's finances deteriorated, and in October 1983, Mrs. Bowen stopped making payroll withholding deposits. These deposits are the federal tax and FICA withholdings from workers' wages; BII holds these funds in trust for the government. *See Bowen*, 836 F.2d at 966–67. Federal law and applicable regulation require that these deposits be made weekly to a designated federal tax account. *See id.* The unpaid taxes grew to over $100,000 before Mrs. Bowen resumed making the deposits in January 1984.

Meanwhile, the Bowens and their accountant explored a plan to restructure BII's debt. To this end, they met on November 29, 1983 with Ron Acton, BII's loan officer at the Bank. In the course of the meeting, "Acton promised the Bowens that the [B]ank would loan them the money to pay the delinquent payroll taxes." [2] According to the promise, the Bank was to make the loan in February 1984, when the IRS was expected to send a delinquency notice.

The new year was not a happy one for BII. In January, the firm failed for the first time to make its monthly loan payment to the Bank. On February 14, Acton informed Mrs. Bowen that the Bank was not going to loan BII the money for payroll taxes; this refusal is the basis of the Bowens' lawsuit. In addition, at the end of February the Bank advised the Bowens that it would not renew BII's existing loans. BII filed for bankruptcy protection a few months later.

Immediately after the bankruptcy filing, the IRS assessed the Bowens individually for the delinquent payroll taxes. Litigation ensued, with the Bowens prevailing in the district court two years later. This court reversed, *Bowen v. United States*, 836 F.2d 965 (5th Cir.1988), in an opinion dated February 5, 1988.

A week later, on February 12, the Bowens filed the present suit against the Bank in the El Paso County Court of Law. Although the Bank's breach of promise had occurred nearly four years earlier, the Bowens cited the release of this court's February 5 opinion in the IRS suit as the time at which they sustained damages. A month after this new suit was filed, the district court entered a quarter-million dollar judgment against the Bowens in the previous (IRS) suit.

Some months later, on July 29, 1988, the Comptroller of the Currency declared the Bank insolvent and appointed the FDIC as receiver. The FDIC removed the Bowens' lawsuit to the U.S. District Court for the Western District of Texas, El Paso Division. *See* 12 U.S.C. § 1819(a) (fourth) and 28 U.S.C. § 1446 (removal authority and

---

**1.** *See also* facts recited in *Bowen v. United States*, 836 F.2d 965, 966–67 (5th Cir.1988) (lawsuit against IRS arising out of same facts as present case).

**2.** *See* Jury's Verdict on Special Interrogatories (Interrogatory No. 1). This point is disputed, but we accept the jury's finding for the purpose of this appeal.

procedure). The case was tried to a jury in March 1989. The Bowens prevailed, with the jury answering eight special interrogatories in their favor and rendering a judgment for actual damages in the amount of $403,793. The FDIC subsequently appealed, arguing *inter alia* that the Bowens' claims were barred by the applicable statutes of limitation and the *D'Oench, Duhme* doctrine.

## II. Discussion

The briefs in this case devote many pages to an examination of the statutes of limitation applicable to each of the Bowens' causes of action, and the tricky question of when these causes accrued. We heard much discussion of these matters at oral argument, and received subsequent letter briefs as well. As the FDIC now concedes, recent case law indicates that the constructive fraud claim, at least, survives a limitations challenge. *See Williams v. Khalaf*, 1990 WL 33531, 33 Tex.Sup.Ct.J. 354 (March 28, 1990) (fraud actions are subject to four-year statute found at Tex.Civ.Prac. & Rem.Code Ann. § 16.004 (Vernon 1986)).

A limitations and accrual analysis of the other two causes of action would take us into less well-charted territory. What statute of limitations applies to promissory estoppel? Under what circumstances is accrual of a cause delayed until adverse judgment is rendered in a prior lawsuit? This is state law terrain whose cartography we leave to the Texas courts. Surveyance by this court is unnecessary because the FDIC has staked a valid claim to a federal defense. The Corporation's argument is that the Bowens' attempt to enforce an oral, unrecorded agreement against the FDIC is barred by the doctrine of *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 460, 62 S.Ct. 676, 681, 86 L.Ed. 956 (1942).[3, 4] We agree. This defense applies to all three causes of action, irrespective of the statutes of limitation and notwithstanding the jury's detailed findings in the Bowens' favor. Because we decide this case based on the *D'Oench* doctrine, the intricacies of the limitations questions do not concern us. No holding on those issues could vitiate the *D'Oench* defense.[5]

The original *D'Oench* case applied only to a secret agreement used as a defense to a suit on a note by FDIC in its corporate capacity ("FDIC–Corporate"). *See id.*, 315 U.S. at 460–61, 62 S.Ct. at 680–81. It barred recourse to such side agreements, citing the "direct relation" between "the integrity of ostensible assets" and the solvency of a bank. *Id.* Here, although the solvency considerations are similar, the fact situation is not. We are presented in this case with an *affirmative* claim, against FDIC–*Receiver*, with *no* note whose terms are subjected to a secret protocol. Nonetheless, *D'Oench* is applicable to the Bowens' claims, because the doctrine has evolved to a rule that today is expansive and perhaps startling in its severity. The doctrinal extension we describe is considerable, but we believe experience has been a wise teacher.

The modern *D'Oench* rule protects the FDIC, as receiver of a failed bank or as purchaser of its assets, from a borrower who has " 'lent himself to a scheme or arrangement' whereby banking authorities are likely to be misled." *Beighley v. Federal Deposit Ins. Corp.*, 868 F.2d 776, 784 (5th Cir.1989) (quoting *D'Oench* ). In par-

---

**3.** The FDIC could also have cited 12 U.S.C. § 1823(e), which is essentially a codification of *D'Oench, Duhme*. Until recently applicable only to FDIC–Corporate, section 1823(e) was amended in August 1989 (prior to briefing in this case) to apply to FDIC–Receiver as well. *See* FIRRE Act, Pub.L. No. 101–73, § 217(4), 1989 U.S.Code Cong. & Admin.News (103 Stat.), 183, 256. Because the FDIC did not brief or argue the applicability of this section, we deem the issue waived.

**4.** The Bowens suggest that the district court struck the *D'Oench, Duhme* defense as a discovery sanction, making it unavailable to the FDIC in this action. However, the district judge's order striking the defense cites substantive rather than punitive reasons. In addition, in an order denying the FDIC's motion for judgment n.o.v., the district court clearly indicated that it did not intend to remove *D'Oench, Duhme* as an issue on appeal.

**5.** For the same reason, we need not address the FDIC's other substantive and evidentiary claims.

ticular, *D'Oench* bars the use of unrecorded agreements between the borrower and the bank as the basis for defenses or claims against the FDIC. *Id.* The agreement need not implicate a specific obligation, such as a note or other asset held by the FDIC. *See Bell & Murphy and Assoc. v. Interfirst Bank Gateway,* 894 F.2d 750, 753 (5th Cir.1990); *Beighley,* 868 F.2d at 784 (applying *D'Oench* to breach of an agreement to extend future loans); *Federal Savs. & Loan Ins. Corp. v. Murray,* 853 F.2d 1251, 1255 (5th Cir.1988) (same). Simply put, transactions not reflected on the bank's books do not appear on the judicial radar screen either. Accordingly, the Bowens' suit must fail, as their claims rely on the Bank's oral promise to extend them a loan.

In an attempt to escape the dungeon of *Duhme,* the Bowens raise a number of claims. Principally, they argue that *D'Oench, Duhme* requires "malfeasance" on the part of the borrower. In support of this contention, they cite our remarks in *Federal Deposit Ins. Corp. v. McClanahan,* 795 F.2d 512, 516 (5th Cir.1986):

> It may be possible to imagine circumstances in which—whether because of prevailing business practices or the maker's extreme lack of sophistication—the signing of a blank note could be so wholly innocent as to preclude [the application of *D'Oench, Duhme* ].

The Bowens would have us interpret "innocent" as denoting "innocent of wrongdoing." However, the quoted passage continues:

> This is not such a case [i.e., not a case involving "wholly innocent" actions]. We hold that McClanahan "lent himself to a scheme or arrangement whereby the [appropriate] banking authority ... was or was likely to be misled."

*Id.* at 516–17 (quoting *D'Oench, Duhme* ). This explication focuses not on malfeasance but simply on whether or not the borrower "lent himself" to an unrecorded scheme or arrangement. Thus, it seems to us that

the better interpretation of "innocent" in the quoted passage is "not lending oneself" to a scheme or arrangement of the sort described. This reading of the text provides no support to the Bowens.

In any event, the citation to *McClanahan* is beside the point, since our more recent holdings explicitly disavow a requirement of malfeasance:

> We can dispense easily with [the] contention that the *D'Oench, Duhme* rule bars only claims or defenses based upon *illegal* side agreements entered into for the purpose of deceiving banking authorities.... [T]he Court [in *D'Oench, Duhme* ] suggested that [the rule applies] even [to] a borrower who ... did not "intend[ ] to deceive any person".... Hence, it is irrelevant ... whether [the borrower] acted in good faith.

*Bell & Murphy,* 894 F.2d at 753–54 (quoting *D'Oench, Duhme* ) (emphasis in original); *see also Beighley,* 868 F.2d at 784 (*D'Oench, Duhme* applies "even when the borrower does not intend to deceive banking authorities [and even if] the underlying transaction [is not] fraudulent").

The lack of a malfeasance requirement makes *D'Oench, Duhme* a sharp sword and sturdy shield indeed. What is the purpose of such imposing armaments? Fundamentally, *D'Oench* attempts to ensure that FDIC examiners can accurately assess the condition of a bank based on its books. The doctrine means that the government has no duty to compile oral histories of the bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes. Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabilities. Perhaps mindful of the fate that befell the Baker, whose search for the Snark ended with his own disappearance, *D'Oench, Duhme* seeks to ensure that a bank's assets do not "softly and suddenly vanish away." [6]

---

**6.** *See* L. Carroll, *The Hunting of the Snark,* Fit the Third and Fit the Eighth [i.e., verses 3, 8] (1876).

The dangers of a contrary policy should be obvious. Today, stable financial institutions sometimes seem as elusive as the Snark. Unrecorded agreements—those rooted in the loose soil of casual transactions as much as those that spring from the malodorous loam of outright fraud—are a threat to the ecology of the banking system that we can ill-afford. To check the growth of these hardy perennials, *D'Oench* forces borrowers to bear the risk that their unorthodox plants will bear no fruit. Those who till these soils may not shift the cost of their peculiar agronomy to the FDIC, the bank's depositors and unsecured creditors, and the taxpayers and depositors who fund the FDIC. *See Bell & Murphy*, 894 F.2d at 753, 754; *McClanahan*, 795 F.2d at 516; *First State Bank v. City and County Bank*, 872 F.2d 707, 715 (6th Cir. 1989).

As to the Bowens' malfeasance requirement, we would decline to adopt it even in the absence of precedent. Adulterating *D'Oench, Duhme* would amount to abandoning a bedrock protection for the uncertainty of quick-clay, a seemingly stable substance notorious for its rapid liquefaction. The firm resolution we provide today would collapse into an uncertain and factbound inquiry, soon to be followed by a landslide of "good faith" claims against the FDIC. We are not willing to remake the topography of the banking system in such a fashion. Nor, apparently, is Congress, which has directed the courts to void unrecorded agreements against the interests of FDIC–Receiver without regard to malfeasance. *See* FIRRE Act, *supra* note 3 (recent amendments to *D'Oench*'s statutory counterpart, 12 U.S.C. § 1823(e)). Accordingly, we reaffirm our earlier holdings: the *D'Oench, Duhme* doctrine is applicable even in the absence of malfeasance.

As an alternative to their malfeasance requirement, the Bowens suggest that *D'Oench* requires at least recklessness or negligence on the part of the borrower. They cite no authority for this proposition, however, and we do not regard it as consistent with our precedent or our holding today. *See, e.g., Beighley*, 868 F.2d at 783–84 (applying *D'Oench* in the apparent absence of negligence or recklessness).

III. Conclusion

Because the Bowens' claims are barred by the *D'Oench, Duhme* doctrine, we REVERSE and RENDER judgment for the FDIC.