**FEDERAL DEPOSIT INSURANCE CORP. as Receiver of Citytrust, Plaintiff,**

v.

**VERNON REAL ESTATE INVESTMENTS, LTD., et al., Defendants.**

No. 91 Civ. 5971 (GLG).

United States District Court, S.D. New York.

July 24, 1992.

O'Conner, Reddy & Jense, P.C. (William M. O'Conner, Bradford D. Conover, of counsel), New York City, for plaintiff.

Pollack & Greene (Michael E. Greene, Edward Land, of counsel), New York City, for defendants Vernon Real Estate Investments, Ltd. and Alan Vernon.

## OPINION

GOETTEL, District Judge.

In recent years, our nation's banking system has been crumbling under the combined weight of bank failures and a depressed economy, a plight that continues to sap the federal government of much of its scarce resources and ordinary people of their financial security. In the midst of all

this, courts must continually decide the fate of the latest in an endless line of failed banks that have slipped into the red and into the courthouse. This case represents another small chapter in an all too familiar story of a loan gone bad, an insolvent bank in receivership, and the federal regulators who step in and settle its tangled affairs.

## I. FACTUAL BACKGROUND

This case concerns a loan made in August 1988 to defendant Vernon Real Estate Investments, LTD. ("VREI") in the principal amount of $6 million for renovation of a building. In connection with this loan, VREI executed in favor of Citytrust a promissory note ("Note") for the same amount payable in monthly installments and due in full in August 1990. Pursuant to a 1988 building loan contract (the "Building Loan Contract"), VREI also executed in favor of Citytrust a mortgage for a property owned by defendants in the Town of Mt. Kisco to secure their obligations under the Note. Additional security for the $6 million loan was provided to Citytrust as a guaranty by the Estate of Alan Vernon.

The Building Loan Contract states that the failure of VREI "to timely make any payment of interest due" on the mortgage constitutes a default. Upon default, Citytrust was entitled under the Building Loan Contract at its option to make the Note and Mortgage "immediately due and payable."

According to plaintiff, the Vernons (referring to both Vernon Real Estate and Alan Vernon) defaulted on the loan in February 1990 after failing to pay the monthly interest due and complete the required improvements, a default in the principal amount of some $5.48 million plus interest. Defendants contend that the default occurred only after Citytrust stopped making interest payments to itself pursuant to the Note. Citytrust notified the Vernons of their default by letter dated June 21, 1990.

In July 1991, Citytrust filed suit seeking foreclosure against the various defendants. The FDIC was appointed receiver for Citytrust by court order on August 9, 1991. The Vernons were notified by letter dated August 22, 1991 that the FDIC had to be notified of any claims against it by November 19, 1991.

Before the court today is the FDIC's motion for appointment of a receiver and summary judgment on the foreclosure of the mortgage. The FDIC argues (1) that a temporary receiver is necessary to prevent any further deterioration in the condition and value of the property; (2) that summary judgment is appropriate on the Vernons' six affirmative defenses and first two counterclaims under the terms of the loan agreements.

The Vernons' affirmative defenses and counterclaims include: failure to state any grounds upon which relief can or should be granted, the wrongful withholding of payments due under the agreement which prevented VREI from completing the contract, unclean hands by Citytrust, and wrongful use of loan funds by Citytrust to pay itself interest it deemed due.

Plaintiff argues that the Vernons' claims are barred because agreements not contained in official loan documents cannot be the basis for any claims against the FDIC under *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (hereinafter *"D'Oench"*), and 12 U.S.C. § 1823(e). Plaintiff also contends that the claims are barred by the FDIC's status as a federal holder in due course and the Vernons' failure to exhaust administrative remedies by not filing a notice of claim with the FDIC after it was appointed receiver.[1]

---

**1.** In its reply memorandum, plaintiff points out that defendants have failed to submit a Statement of Facts pursuant to Rule 3(g) of the Joint Rules for the United States District Courts of Southern and Eastern Districts of New York. Defendants' failure to submit their own Rule 3(g) Statement means that the facts included in plaintiff's Rule 3(g) Statement are deemed admitted by defendants. Had plaintiff included

such "undisputed" facts as "All advances made by Citytrust were proper under the terms of the Building Loan Contract" or something equally sweeping in scope, defendants' omission of a counter-Rule 3(g) statement might have been dispositive. However, none of the facts in plaintiff's Statement deemed admitted dispose of the core issues of this motion.

Defendants respond that a temporary receiver is not justified given that the FDIC is responsible for not responding to inquiries by prospective tenants located by Vernon, and that Citytrust and the FDIC have failed themselves to take any action regarding a new roof, the primary problem with the building. Defendants also contend that summary judgment is improper because of factual issues surrounding the breach of contract claims they alleged. They argue that Citytrust was contractually obligated to distribute loan funds to enable VREI to construct an office building. Further, defendants contend that the bank's failure to do so resulted in the building not being finished, the failure to obtain a certificate of occupancy, and failure to lease the 20% of the improved space required by the building loan contract. Therefore, they maintain, the *D'Oench* doctrine is inapplicable because no secret side agreements to deceive regulators were involved, only a breach of the express written contract.

## II. DISCUSSION

### A. Appointment of Temporary Receiver

We address first the FDIC's request for the appointment of a temporary receiver. The FDIC argues that New York law expressly and unequivocally entitles it to have a receiver appointed during the pendency of the foreclosure action. Defendants strenuously argue that, despite the applicable New York statutes and lease provision, appointment of a receiver is not a matter of absolute right but rather a matter of equitable discretion by the court.

Under New York law, the FDIC is granted broad powers to have a receiver appointed in a foreclosure action where the underlying mortgage so provides. In particular, New York law provides:

A covenant "that the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver," must be construed as meaning that the mortgagee, his heirs, successors or assigns, in any action to foreclose the mortgage, shall be entitled, without notice and without regard to adequacy of

security of the debt, to the appointment of a receiver of the rents and profits of the premises covered by the mortgage; and the rents and profits in the event of any default or defaults in paying the principal, interest, taxes, water rents, assessments or premiums of insurance, are assigned to the holder of the mortgage as further security for the payment of the indebtedness.

New York Real Property Law ("RPL") § 254 (McKinney 1989); *see also* New York Real Property Actions and Procedures Law § 1325(1). In the present case, the mortgage provides "[t]hat the holder of this mortgage, in any action to foreclose, shall be entitled to the appointment of a receiver." Ferguson Affidavit, Exhibit M at ¶ 5.

Plaintiff is correct that lack of notice or insufficient security are not grounds to resist appointment of a receiver. However, the court has the discretion to deny appointment of a receiver under the appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment. *See Foxfire Enterprises, Inc. v. Enterprise Holding Corp.*, 837 F.2d 597, 598 (2d Cir.1988) (citing *Clinton Capital Corp. v. One Tiffany Place Developers, Inc.*, 112 A.D.2d 911, 492 N.Y.S.2d 427 (2nd Dep't 1985)).

Although no automatic entitlement to a receiver exists, we shall not deny the appointment of a receiver unless the circumstances require us to as a matter of equity. Since both RPL § 254 and the mortgage itself give plaintiff a right to a receiver, although not absolute, it is incumbent upon defendants to demonstrate why a receiver should not be appointed.

Defendants argue that the circumstances here do not warrant a receiver. Specifically, they contend that Vernon has presented prospective new tenants to plaintiff and no substantial deterioration has occurred except possibly further damage associated with the need for a new roof, a situation exacerbated by plaintiff's failure to remedy this known threat. Defendants also stress that Vernon is on the premises

on a daily basis, lives nearby, and has personally performed tasks necessary for the daily maintenance of the building. They also note Vernon's willingness to provide monthly reports on the condition of the premises to plaintiff. From this, defendants conclude that the circumstances show no necessity for plaintiff's application for a receiver.

It appears undisputed after oral argument that, with the exception of Vernon, all but one commercial tenant has vacated the premises during this current year. In addition, plaintiff states that certain "prospective tenants" were rejected because Vernon had placed conditions such as additional funding or forbearance of a foreclosure action to their proposals. Plaintiffs also highlight the significant decrease in the building's appraised value that has occurred over the last two years as evidence of the premises' deteriorating condition. Defendants have offered nothing to dispute the drop in the building's appraised value.

■ The parties debate how necessary a receiver is for upkeep of the building. However, where the mortgagor has defaulted, the mortgagee has accelerated the entire debt pursuant to the mortgage, and full payment has not been tendered, proof of the necessity of a receiver is not required. *See Febbraro v. Febbraro*, 70 A.D.2d 584, 416 N.Y.S.2d 59, 59–60 (2nd Dep't 1979). And while we may question whether a receiver will be available to the same degree as Vernon, who maintains his office on the premises, the equities do not tip against plaintiff enough to justify denying their application for appointment of a receiver. Therefore, we grant this portion of plaintiff's motion.

**B. The *D'Oench* Doctrine**

We next turn to plaintiff's motion for summary judgment of foreclosure. As it is often stated, to prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are facts that "might affect the outcome of the suit under the governing law ... [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Plaintiff principally argues that defendants' various affirmative defenses and counterclaims must fail because of the doctrine announced in *D'Oench* and later codified at 12 U.S.C. § 1823(e).[2] In short, plaintiff argues that any oral or side agreements between Citytrust and defendants to fund the entire face amount of the Note and Mortgage in financing the construction project cannot be the basis of a claim against the FDIC.

The crux of defendants' response is that their affirmative defenses and counterclaims rest upon specific contractual obligations under the Building Loan Contract and Mortgage. In essence, they argue that by wrongfully withholding certain payments and inadequately funding the construction, Citytrust breached its written agreements. Therefore, say defendants, their claims are not barred by *D'Oench* or § 1823 since they are based on written loan documents. And at the very least, they argue, an issue of facts exists as to whether Citytrust frustrated the purpose of the loan when it breached the express terms of the Building Loan Contract by failing to advance sufficient funds for construction

**2.** Section 1823(e) of Title 12 provides:
No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(4) has been, continuously, from the time of its execution, an official record of the depository institution.

costs while advancing funds for interest payments due to itself.

■ Our starting point then must be the Building Loan Contract itself. If defendants' claims are not based upon express terms of the contract, the *D'Oench* doctrine would seem to preclude the raising of these defenses. If, however, a defense or counterclaim is based upon the breach of the loan agreements that meet the requirements of § 1823, the *D'Oench* doctrine would not apply. *See FDIC v. Laguarta,* 939 F.2d 1231, 1238–39 (5th Cir.1991); *Howell v. Continental Credit Corp.,* 655 F.2d 743, 746 (7th Cir.1981).

The Building Loan Contract expressly provides that the "net sum available to Borrower(s) for the Improvements is ... $4,055,463.72, less any amounts that may become due or payable for insurance premiums, interest on building loan mortgages, ground rent, taxes, assessments, water rates and sewer rents accruing during the construction of the Improvements." Ferguson Affidavit, Exhibit N at p. 3. According to defendants, page 4 of the contract lists $1,338,241.48 as the total sum for interest, taxes, fees, and the like to be subtracted from the approximately $4 million net sum for Improvements. Defendants contend that a balance of approximately $2.7 million was supposed to be available for actual construction costs, an amount Citytrust refused to fully advance.

In response, plaintiff points out that the contract clearly stated in capital letters at the bottom of the third page that:

ADVANCES WILL BE SUBJECT, HOWEVER TO THE FOLLOWING LIMITS AND HOLDBACK PROVISIONS:

\* \* \* \* \* \*

In no event will more than 3.8 million dollars be advanced until at least 20% (9892 square feet) of the improved space is leased at a rental of $22/per square foot or better ... unless Lender approves in advance rent concessions to tenant.

Defendants do not contest Citytrust's discretion in this situation to make advances in excess of $3.8 million. What defendants object to was the manner in which Citytrust funded the loan over and above the $3.8 million level, namely funding interest payments due to itself instead of making advances for actual construction costs.

The language of this condition, however, is clear. The defendants had no right to advances beyond $3.8 million until at least 20% of the improved space was rented. There is no dispute that this condition was never met by defendants. Hence, under the express terms of the Building Loan Contract, it was up to Citytrust to decide what advance rent concessions to make to defendants. The contract contained no provisions providing a schedule of additional advances specifying what these advances must pay for or requiring Citytrust to first advance sums for construction costs.

It is true that by advancing funds to cover the interest payments due, Citytrust was placing protection of its investment first before sinking additional funds into construction. However, nothing in the contract prevented this and defendants benefited from this by avoiding defaulting on interest payments due for a period of time.

Plaintiff contends that "[n]one of the counterclaims alleged by the VERNONS are reflected in the records of CITYTRUST" and therefore cannot be asserted against the FDIC. Plaintiff's Memorandum of Law at 16. Plaintiffs also state repeatedly that defendants claims are based upon some extrinsic agreement and are thus barred by law. From our discussion above, however, it is apparent that the core of defendants' claims concern what advances the Building Loan Contract required Citytrust to make for actual construction costs and interest payments. These claims arise not from any extrinsic or secret agreement but directly from the text of the Building Loan Contract.

It is doubtless true that *D'Oench* gives the FDIC formidable protections unavailable to ordinary creditors. But it does not shield them from claims based upon the express language of loan agreements made by an insolvent depository institution for whom the FDIC has been made the Receiv-

er, as is the case here. With certain exceptions, defendants' claims are not, despite plaintiff's characterization, based merely on a failure to advance funds on a construction loan, but rather a failure to fund a construction loan in accordance with the express written provisions of that loan.

Defendants have not argued to the court that they were entitled to disbursement of the full face amount of the Building Loan, or $6 million. Rather, they contend that they were contractually entitled to receive, after specific amounts were deducted for interest and other fees, approximately $2.7 million. As such, *D'Oench* is inapplicable to many of defendants' defenses as is § 1823(e) given that plaintiff does not deny that the Building Loan was not an official record of Citytrust.

Many of the cases cited by plaintiff which apply the *D'Oench* doctrine involve claims based upon oral agreements or fraud. *See, e.g., Langley v. FDIC,* 484 U.S. 86, 94, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987) (fraudulent inducement claim barred by § 1823(e)); *Bowen v. FDIC,* 915 F.2d 1013, 1017 (5th Cir.1990) (claim involving an oral, unrecorded agreement barred by *D'Oench* doctrine). Since such cases do not involve claims based upon the language of official written contracts, they have little application here.

■ The *D'Oench* doctrine applies only to the extent that certain of the affirmative defenses rest upon claims that fall outside the express provisions of the Building Loan Contract, Note, and Mortgage. As such, claims in the second affirmative defense for negligence, want of care, and poor business decisions, and the third affirmative defense of "unclean hands" on the part of Citytrust, are barred as a matter of law. These claims, more equitable and "personal" in nature, are not rooted in any express language of the loan agreements and are thus barred by *D'Oench*. Plaintiff's motion for summary judgment is therefore granted in part based upon the *D'Oench* doctrine and § 1823(e).

■ However, to the extent their claims are based upon express provisions of the loan agreements, neither *D'Oench* nor § 1823 bar defendants from raising the claims in the second, fourth, fifth, and sixth affirmative defenses for wrongful withholding of funds and improper distribution of funds under the loan agreements.

Our conclusion regarding the inapplicability of *D'Oench* to these portions of defendants' defenses does not mean, however, that defendants must prevail on any of the remaining claims. It simply means that the defenses rooted in the terms of the Building Loan Contract are not barred wholecloth by *D'Oench* or § 1823. Provided no other general bar to them exists, it must be determined whether Citytrust breached the express terms of the agreements.

### C. Federal Holder in Due Course Status

■ The FDIC additionally argues that its status as a federal holder in due course bars defendants from raising their counterclaims and affirmative defenses. The federal holder in due course doctrine bars the makers of promissory notes from asserting certain "personal" defenses in connection with purchase and assumption transactions involving insolvent banks.

■ Plaintiff admits that it does not meet the technical requirements for such status, in particular its acquisition of notes through purchase and assumption rather than through the normal course of business. However, courts have granted such status to the FDIC as a matter of federal common law due to the federal interests in protecting the banking system. *See, e.g., Campbell Leasing, Inc. v. FDIC,* 901 F.2d 1244, 1249 (5th Cir.1990); *see also FDIC v. Wood,* 758 F.2d 156, 161 (6th Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985) (granting federal holder in due course status to FDIC as a matter of federal common law); *FSLIC v. Murray,* 853 F.2d 1251, 1256 (5th Cir.1988) (granting FSLIC same status).

The court in *Campbell Leasing* noted that insuring the uninterrupted operation of troubled banks and minimum harm to depositors by quickly arranging purchase and assumption transactions meant protect-

ing the FDIC against having to litigate all possible "personal" defenses. Granting the FDIC federal holder in due course status, the court reasoned, insured its ability "to effectively perform its congressionally mandated function." *Campbell Leasing*, 901 F.2d at 1249. The court also specifically rejected the notion that the FDIC could not have this status when acting in its receivership function. *Id.*

Defendants, however, cite contrary authority for proposition that when suing in its capacity as receiver, the FDIC as receiver is not a federal holder in due course and thus not immunized from defenses beyond those already barred by *D'Oench*. In *FDIC v. Laguarta*, a Fifth Circuit case which in dictum seems to reach a result contrary to *Campbell Leasing*, another Fifth Circuit case, the court stated:

> We likewise reject the Receiver's [FDIC's] Argument ... that Laguarta's defenses are barred by the federal common-law holder in due course doctrine. Here the FDIC sues only in its capacity as receiver for the institution which made the loan and is payee in the note sued on, and the FDIC does not assert, nor does the record establish, the loan or note has ever been transferred or was ever part of a purchase and assumption transaction. To the extent that it precludes defenses beyond those precluded by *D'Oench, Duhme*, the federal holder in due course doctrine is inapplicable to such a situation.

939 F.2d at 1239, n. 19 (citing *Gunter v. Hutcheson*, 674 F.2d 862, 872–73 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)).[3]

To the extent that defendants' claims are based upon their interpretation of explicit provisions of the Note and Building Loan Contract, the rationale for extending federal holder in due course status to the FDIC here does not apply. As the court in *Campbell Leasing* persuasively reasoned:

> If the FDIC were required to determine the value of the bank's notes in light of

all possible "personal" defenses, a purchase and assumption transaction could not take place in the timely fashion necessary to ensure "uninterrupted operation" of the bank and the "safety and liquidity" of deposits.

901 F.2d at 1248. Here, however, the contractually-based defenses raised by defendants are not "personal" defenses like the claims of tortious interference with contract, bad faith, and infliction of emotional and mental distress at issue in *Campbell Leasing*. As we said earlier, several of defendants' claims are founded upon express provisions of the Building Loan Contract. Therefore, we decline to extend federal holder in due course status to the FDIC under these circumstances.

### D.   Exhaustion of Administrative Remedies

Plaintiff's third argument is that defendants' counterclaims are barred by their failure to exhaust administrative remedies. They argue that these claims were not presented to the FDIC for review pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821(d)(3). Plaintiff contends that no notice of claim was filed by the Vernons before November 19, 1991, the end of the required statutory period.

Defendants argue in response that the Supreme Court in *Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp.*, 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989), in considering claims against the FSLIC, held that claimants against the agency were entitled to judicial review of their claims regardless of any failure to exhaust administrative remedies. Secondly, defendants argue that the counterclaims were interposed against Citytrust in August 1991, before the FDIC was even appointed receiver for Citytrust. Thus, ask defendants, why must they pursue administrative remedies when they already stand in court in an adversarial posture toward Citytrust, and subsequently the FDIC as its receiver?

---

**3.** Curiously, the court in *Laguarta*, while concluding that the federal holder in due course doctrine did not apply to the FDIC in its capaci-

ty as receiver, also cited *Campbell Leasing* for this proposition even though *Campbell Leasing* seems to reach a contrary conclusion.

As other courts have noted, the FIRREA was explicitly drafted to satisfy the procedural shortcomings of administrative review identified by the Supreme Court in *Coit. See Circle Industries v. City Federal Sav. Bank,* 749 F.Supp. 447, 455 (E.D.N.Y.1990), *aff'd,* 931 F.2d 7 (2d Cir.1991). In so doing, Congress expressly withdrew jurisdiction from all courts over any claim to a failed bank's assets made outside the procedures established in § 1821. The claims procedures set up in § 1821(d) are designed to be exclusive. However, we must resolve whether these procedures also apply to claims that have already been raised before the FDIC was appointed receiver.

In most of the cases cited by plaintiff, the regulatory agency involved, be it the FDIC or Resolution Trust Corporation, was appointed receiver for the failed banks *before* a court action was filed. Under these circumstances, there is no doubt that a party asserting a claim against an insolvent bank's assets must first follow the procedures set forth in § 1821(d). *See, e.g., FDIC v. Shain, Schaffer & Rafanello,* 944 F.2d 129, 130–31 (3rd Cir.1991) (claims barred by § 1821 in suit where receiver appointed before suit filed); *Circle Industries,* 749 F.Supp. at 453 ("Since the RTC was appointed Receiver ... before Circle Industries brought this action ... the Court does not have jurisdiction to hear the claims asserted by Circle Industries against [the insolvent banks].").

In one case, *Everett N. Dobson & Sons, Inc. v. Dictar Associates II,* 764 F.Supp. 1 (D.Me.1991), the FDIC, after moving to be substituted for an insolvent bank that had been sued in federal court, moved to dismiss the action for failure to exhaust administrative remedies pursuant to § 1821(d). The court permitted the substitution and held that the dictates of § 1821(d) were clear and unambiguous; the court lacked jurisdiction over the claims asserted against the failed bank. *See id.* at 2.

While not binding on this court, we reach the same conclusion. Section 1821(d)(13)(D) of Title 12 explicitly restricts the jurisdiction of federal district courts:

**(D) Limitation on judicial review**

Except as otherwise provided in this subsection, no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

The FIRREA does not limit the application of this subsection to claims filed after the Corporation has been appointed receiver. By its unambiguous terms, it applies to "any action seeking a determination of rights" and claims relating to "any act or omission" of a failed bank. We see no reason to read into this blanket withdrawal of jurisdiction any limitation for claims already pending before a court.

Indeed, an exception for claims already pending is both unnecessary and would undermine at least one of the statute's primary objectives. If defendants had filed their claims with the FDIC pursuant to § 1821 and were dissatisfied with the FDIC's determination, they would still retain the option of seeking judicial review of their claims pursuant to § 1821(d)(6).[4]

In addition, permitting defendants to maintain their counterclaims in this court would frustrate one purpose of the FIRREA, allowing a large number of claims to be resolved by the FDIC without unduly burdening the courts or delaying the expe-

---

**4.** Section 1821(d)(6) provides that within 60 days after the 180-day period following a claim's submission to the FDIC, or within 60 days of the date of any notice of disallowance of the claim by the FDIC, a claimant may seek either administrative review or judicial review of the FDIC's determination or inaction in a federal district court located in the district within which the depository institution's principal place of business is located or in the federal district court for the District of Columbia. *See* 12 U.S.C. § 1821(d)(6).

ditious resolution of all claims against failed financial institutions. *See Circle Industries*, 749 F.Supp. at 453 (quoting a Report of the House Banking, Finance and Urban Affairs Committee recommending passage of FIRREA). Therefore, after concluding that this court lacks jurisdiction over claims not first filed with the FDIC, we grant plaintiff's motion to dismiss defendants' two counterclaims.

### E. The Contract Provisions

We are thus left with defendants' six affirmative defenses. As we have held, the FDIC is not entitled to federal holder in due course status in this case. Further, the *D'Oench* doctrine only bars those defenses which are not grounded on the express provisions of the Building Loan Contract, Note, or Mortgage. These include claims in the second affirmative defense for negligence, want of care, and poor business decisions, as well as the third affirmative defense of "unclean hands." We must still determine whether plaintiffs are entitled to summary judgment on the affirmative defenses based upon the improper withholding of funds in violation of the express provisions of the loan agreements.

■■■ Defendants argue that the contract language regarding the amounts Citytrust was obligated to advance, specifically for construction costs and interest payments, is ambiguous at best. Therefore, they continue, questions of fact exist as to the proper interpretation of the contract and the parties' intent, questions which preclude granting summary judgment. We note, however, that the ambiguity of contract language is a question of law, not fact. *See Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1026 (2d Cir.1991).

■■■ In addition, defendants stress that the absence of any discovery to date of the bank files in possession of the FDIC supports a denial of summary judgment at this point. Ordinarily this might be true. However, here the issues to be resolved turn on the language of the contract and certain undisputed facts regarding the loan advances made by Citytrust.

For the remaining claims, it must be determined whether the manner in which Citytrust advanced funds to the Vernons breached the express provisions of the Building Loan Contract as defendants claim. As we noted earlier, Schedule B of the Building Loan Contract lists the manner in which loan funds were to be disbursed. However, this schedule of disbursements was subject to a cap of $3.8 million until defendants leased at least 20% of the building's improved space at a price of $22/per square foot or better.

There is no dispute that defendants failed to meet the 20% leasing requirement. The Building Loan Contract is also clear that once Citytrust had advanced $3.8 million, they were not required to further fund any aspect of defendants' construction project until the 20% requirement was met. Defendants have not alleged that any advances made by Citytrust before the $3.8 million mark was reached violated Schedule B.

Instead, what they apparently argue is that Citytrust breached the contract by making advances above the $3.8 million ceiling only to cover the monthly interest payments due to it, advances say defendants not in accord with Schedule B which required $2.7 in advances for actual construction costs. It was only when Citytrust stopped making these interest payments to itself in February 1990 that defendants were deemed in default.

The determinative question then is whether Citytrust breached the contract by making such interest payments once total advances reached $3.8 million when less than $2.7 million had been advanced for construction costs. Based upon the express terms of the Building Loan Contract, the court concludes that the answer is no. Defendants ran afoul of three contractual obligations. First, the contract required completion of all improvements and a building ready for occupancy by August 17, 1989. When the Vernons failed to meet this deadline, they were in breach of the contract.

Second, the contract included a holdback provision allowing Citytrust to hold back 10% of the hard cost budget until defendants completed construction and rentals for the premises had reached the break even level for debt service. Defendants do not contend that they satisfied these conditions, indeed they did not, so Citytrust was contractually entitled to a 10% holdback. Lastly, Citytrust was under no obligation to make any advances over and above $3.8 million until defendants leased 20% of the improved space. When Citytrust's total advances reached $3.8 million, any further advances were discretionary.

Such discretionary advances, whether for interest or actual building costs, did not violate the contract. Paragraph 4 of the Building Loan Contract states that the "Lender [Citytrust] may advance all or part of any installment before the date that it is due." Additionally, Paragraph 11(B)(3) provides that the "Lender may continue to pay installments without giving up any of Lender's rights or waiving them." Thus, Citytrust had broad discretion to continue making advances once defendants had defaulted.

When applied to advances beyond the $3.8 million, the meaning of these provisions is clear. Once total advances equalled $3.8 million and less than 20% of the improved space had been leased by defendants, Citytrust could, at its option, continue to make advances for interest. Although further advances were not required until defendants satisfied the 20% leasing requirement and holdback criteria, the contract gave Citytrust the discretion to continue making advances for the interest installments as they became due.

No doubt Citytrust did so for some time hoping that defendants might yet complete the building improvements and increase their leasing. But Citytrust was under no obligation to give defendants any such grace period. They could have declared defendants in default long before this; they chose instead to cover the interest for some time, a choice explicitly permitted by the contract's terms. Their decision ultimately to halt these discretionary advances

represented no violation of the Building Loan Contract. There is also no indication in the record that any of these actions by Citytrust represented unconscionable behavior justifying excusal of defendants' default. *See Thrift Ass'ns Service Corp. v. Legend of Irvingtion*, 152 A.D.2d 666, 544 N.Y.S.2d 20, 21 (2nd Dep't 1989).

To conclude, we grant plaintiff's motions for appointment of a receiver and summary judgment and direct the Clerk to enter judgment in favor of plaintiff.

SO ORDERED.