ARMSTRONG, Judge.
In this foreclosure proceeding defendants, Regina Elms Keever, The Michael Elms Mauberret — John J. Elms Sr. Testamentary Trust, and The Andrea B. Mauber-ret Trust — C (collectively referred to as “the Keevers”) appeal a default judgment entered against them and in favor of Pelican Homestead and Savings Association (“Pelican”).[1] For the reasons that follow, we affirm the judgment of the trial court.
On December 31, 1985, Gretchen Kuntz, wife of/and John J. Elms Jr. (“the Elms”), who are also named as defendants in this action, borrowed $2,124,594.75 from Gulf Federal Savings Bank (“Gulf Federal”), as evidenced by a promissory note made payable to the order of Gulf Federal. The note was secured by the pledge of a $4,000,-000.00 collateral mortgage note executed by the Elms and the Keevers in favor of Gulf Federal. The collateral mortgage note was itself secured by an act of collateral mortgage, which encumbers certain immovable property now owned by R. Keever Realty, Inc. However, at the time *984 of the execution of the mortgage, the property at issue was owned in indivisión by the Elms and the Keevers.
The promissory note became due and the Elms subsequently filed for bankruptcy. On June 28, 1990, Pelican, as successor in interest to Gulf Federal and holder and owner of the promissory note, filed suit on the note seeking to foreclose the collateral mortgage on the Keevers’ property, in preference to property owned by the primary obligors, the Elms.[2] In response thereto, the Keevers filed exceptions of prematurity and lack of discussion which were overruled by the trial court on June 21, 1991.[3] On June 26, 1991, the Keevers filed notice of intent to apply for supervisory writs and were granted thirty days in which to do so by the trial court.[4] On July 2, 1991, Pelican obtained a preliminary default against the Keevers after the Keev-ers failed to file an answer. Pelican confirmed the preliminary default on July 9, 1991 and obtained a judgment against the Keevers. On July 22, 1991, the Keevers filed a motion for a new trial which was denied by the trial court. This appeal was subsequently taken.
On appeal, the Keevers claim the trial court erred in granting the default judgment because the trial court had orally granted them an additional thirty days in which to file responsive pleadings while they applied for writs to this court relating to the trial court’s overruling of the exceptions. In addition, the Keevers claim the trial court erred in overruling their exceptions of prematurity and lack of discussion.
PREMATURITY
The Keevers claim that when the trial court granted them an additional thirty days in which to seek writs from this court on the trial court’s denial of the dilatory exceptions of prematurity and lack of discussion, it also granted them an additional thirty days in which to file responsive pleadings. The Keevers maintain that the thirty-day period had not elapsed at the time the default judgment was rendered and, therefore, that the default judgment was granted prematurely.
La.C.C.P. art. 1001 states the general rule as to the time in which an answer must be filed after a judgment overruling an exception. It provides:
When an exception is filed prior to answer and is overruled or referred to the merits, or is sustained and an amendment of the petition ordered, the answer shall be filed within ten days after the exception is overruled or referred to the merits, or ten days after service of the amended petition. The court may grant additional time for answering.
The record furnishes no evidence that the trial court granted the Keevers additional time in which to file responsive pleadings after denying the exceptions and granting them additional time in which to seek writs. The RTC points out that if the trial court had indeed granted such additional time to the Keevers, it would have granted the Keevers’ motion for new trial filed after the default judgment had been granted. The trial court denied the motion for new trial.
It is absolutely essential that an answer be filed prior to confirmation of a preliminary default in order to set aside and render invalid a default judgment. American Bank & Trust Co. of Lafayette v. Huval Fin., 460 So.2d 91 (La.App. 3rd Cir.1984), citing American Bank & Trust Co. v. Marbane Investments, Inc., 337 So.2d 1209 (La.App. 3rd Cir.1976).
Considering the record evidence, we are unable to say that the trial court erred in granting a preliminary default, confirming *985 the default and rendering judgment in favor of Pelican.
DISCUSSION
Both the collateral mortgage note and the act of collateral mortgage securing it were signed by Gretchen Elms, John Elms and Regina Keever in their individual capacities, and on behalf of the Michael Elms Mauberret — John J. Elms Sr. Testamentary Trust. Regina Keever signed the mortgage note with the Elms as a principal and solidary obligor. The collateral mortgage note stated in pertinent part:
Every person at any time liable for the payment of the debt evidenced hereby waives any homestead or exemption rights against said debt. The makers of this note and the endorsers, guarantors and sureties hereon hereby severally waive presentment for payment, protest, and all pleas of division and discussion, and agrees that the time of payment, hereof may be extended from time to time one or more times, without notice of such extension or extensions and as original promissors, for the payment here in principal, interest, costs and attorney’s fees. (Emphasis added).
Thus, the clear unambiguous language of the note evidences that Regina Keever waived the right of discussion. That is, she waived her right to demand that the creditor proceed against the Elms’ property before proceeding against the Keevers’ property in the event of a default on the obligation.[5]
Controverting the clear unambiguous language of the collateral mortgage note, the Keevers maintain that an oral agreement existed between Regina Keever and John Mmahat, the former president of Gulf Federal, which altered the terms of the loan documents and effectively preserved the right of discussion in the event of default on the loan. The Keevers produced the sworn affidavit of Regina Keever in which she recited that in order to induce her to mortgage her property as security for the obligations of the Elms, Mmahat “represented to her” that the property of the Elms would be seized and sold before and in preference to hers. The affidavit further recites that in reliance on Mma-hat’s promises, Regina Keever provided security for the obligations of the Elms in the form of a mortgage of her real property in favor of Gulf Federal.
Assuming arguendo, that an oral agreement was discussed, Pelican correctly points out the fact that such an agreement could not be asserted against them. In the United States Supreme Court case of D’Oench, Duhme & Company, Inc. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1941), the Court held that a defendant would not be allowed to assert a defense to a claim by the FDIC that a written agreement which is valid on its face, is modified by an undisclosed secret agreement. This ruling is commonly referred to as the D’Oench, Duhme doctrine. “The crux of the D’Oench, Duhme doctrine is the public policy of preventing a secret agreement from being used as a defense to a claim based upon a written instrument by the FDIC.” FDIC v. Hoover-Morris Enterprises, 642 F.2d 785, fn.4 (5th Cir.1981). D’Oench, Duhme protects the FDIC (and now, the RTC) from “secret agreements” which deceive or would tend to deceive banking authorities with respect to the assets of a bank.
The court’s decision in D’Oench, Duhme was subsequently codified and expanded in 12 U.S.C. § 1823(e). FDIC v. Blue Rock Shopping Center, 766 F.2d 744 (3rd Cir.1985). As amended, § 1823(e), also applies to RTC as well as FDIC as specifically provided in 12 U.S.C. § 1441a(b)(4). 12 U.S.C. § 1823(e) provides in relevant part that:
No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be *986 valid against the Corporation unless such agreement (1) is in writing... .[6]
Of the other enumerated exceptions contained in the above-cited provision, none of them apply to the case before us.
In Texas Refrigeration Supply v. FDIC, 953 F.2d 975 (5th Cir.1992), the Court held that “the modern D’Oench, Duhme doctrine has been expanded to bar the use of unwritten agreements as the basis of any defense or claim against the FDIC”, and citing Bowen v. FDIC, 915 F.2d 1013 (5th Cir.1990), adds, even if the agreement does “not implicate a specific obligation, such as a note or other asset held by the FDIC.” In the case before us we are compelled to agree with the description of the D’Oeneh, Duhme doctrine as articulated by the court in Bowen:
[The] rule ... is expansive and perhaps startling in its severity. The doctrinal extension we describe is considerable, but we believe experience has been a wise teacher.
* * * * * *
Simply put, transactions not reflected on the bank’s books do not appear on the judicial radar screen either.
* * # sfe sf! sjc
The doctrine means that the government has no duty to compile oral histories of the bank’s customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially unencumbered notes.
* Sf5 * * * *
Unrecorded agreements — those rooted in the loose soil of casual transactions as much as those that spring from the malodorous loam of outright fraud — are a threat to the ecology of the banking system that we can ill-afford.
Id. at 1015-1017.
The Keevers urge this court to adopt the position that the right of discussion was preserved by an oral agreement and that this unrecorded oral agreement required Pelican and now the RTC, to have seized and sold at a public auction a partial undivided interest in property to then be owned in indivisión. Such a constraint on the institutions ability to collect on the loan would limit the assets of the institution within the meaning of 12 U.S.C. § 1823(e) and D’Oench, Duhme. We believe the Keevers are barred by 12 U.S.C. § 1823(e) and D’Oench, Duhme from pleading the alleged oral agreement between Regina Keever and John Mmahat. Thus, the trial court did not err in overruling the dilatory exception of lack of discussion and the exception of prematurity.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
PLOTKIN, J., concurs.

. Two other defendants to the suit, Gretchen Elms and John Elms Jr., are not before us in this appeal as they were represented by a curator ad hoc who answered this action on their behalf and proceeded pursuant to La.C.C.P. art. 5091, et seq.

.Gulf Federal Savings Bank and its assets were transferred by the FSLIC as receiver of the bank to Gulf Federal Savings and Loan Association, which institution merged into Pelican. In 1992, the Resolution Trust Company ("RTC”) was appointed as receiver for Pelican. The RTC is presently before us in this appeal.

. On June 14, 1991 an in rem judgment was taken against the curator appointed to represent the Elms after Pelican was unable to effect service on the Elms.

. On August 19, 1991, this court refused writs, declining to exercise our supervisory jurisdiction.

. The obligation in the instant case was incurred prior to the 1987 revision of the Louisiana Civil Code Obligations articles which eliminated the right of discussion. Formerly, the right of discussion was provided for by La.C.C. arts. 3045-3049.

. That portion of § 1823(e) which governs any agreement that "tends to diminish or defeat the interest of the Corporation in any asset acquired by it ... as receiver of any insured depository" institution also protects RTC. Adams v. Madison Realty & Development, Inc., 746 F.Supp. 419 (D.N.J.1990).